COCA-COLA CO. v. J. G. BUTLER & SONS.

(District Court, E. D. Arkansas, W. D.   February 7, 1916.)

No. 1857.

1. TRADE-MARKS AND TRADE-NAMES ⊕⇒1—INFRINGEMENT—DECEPTION OF PUB-
   LIC.
   The protection given by law to trade-marks has for its object the pro-
   tection of the owner in his property, and the protection of the public
   from deception, by reason of a misleading claim that the article bearing
   the trade-mark is the article manufactured by the owner of the trade-
   mark, when in fact it is but a substitute.
   [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent.
   Dig. §§ 1, 3; Dec. Dig. ⊕⇒1.]

2. TRADE-MARKS AND TRADE-NAMES ⊕⇒57—INFRINGEMENT—DECEPTION OF
   PUBLIC.
   The use of any simulation of a trade-mark which is likely to induce
   common purchasers, exercising ordinary care, to buy the article to which
   the trade-mark is affixed, thereby indicating that it is the product of the
   owner of the trade-mark, is unlawful, and will be enjoined.
   [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent.
   Dig. § 65; Dec. Dig. ⊕⇒57.]

3. TRADE-MARKS AND TRADE-NAMES ⊕⇒68—UNFAIR COMPETITION—USE OF
   TRADE-MARK.
   Plaintiff, a manufacturer of a syrup constituting the principal ingredi-
   ent of a beverage sold at soda fountains and in bottles, made up the
   syrup in two forms—one for sale through jobbers for soda fountains, and
   one intended for use in bottling and sold by it only to bottlers selected,
   designated, and licensed by it, and authorized to use thereon its dis-
   tinctive tops and labels bearing its trade-mark—there being some dif-
   ferences in the two syrups, on account of the different purposes to which
   they were to be put. It guaranteed its product to be wholesome and uni-
   form, as well as its cleanliness and excellence of manufacture, and main-
   tained an elaborate system for the inspection of the plants of its licensed
   bottlers.  Defendant purchased from jobbers the syrup intended for soda
   fountain use, and used it in manufacturing a bottled preparation which
   it was selling under the name of plaintiff's product, using the tops and
   labels prepared by plaintiff for its product.  Held, that this constituted
   unfair competition, and would be enjoined.
   [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent.
   Dig. § 79; Dec. Dig. ⊕⇒68.]

4. TRADE-MARKS AND TRADE-NAMES ⊕⇒67—RIGHT TO MONOPOLY—STATUTORY
   PROVISIONS.
   The monopoly given the owner of a trade-mark by the trade-mark laws
   is not forbidden by the Sherman Act (Act July 2, 1890, c. 647, 26 Stat.
   209), or any other act of Congress.
   [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent.
   Dig. § 78; Dec. Dig. ⊕⇒67.]

5. MONOPOLIES ⊕⇒17—SALES OF GOODS—DISCRIMINATION.
   Where the manufacturer of a syrup, used as the principal ingredient
   in a beverage and sold by it only to bottlers licensed by it, guaranteed the
   purity and quality of the beverage by using distinctive tops and labels on
   its bottles, and to protect itself against claims for damages on the guar-
   anty maintained a system of inspection of the plants of its licensed
   bottlers, it did not violate the Sherman Act, as its requirements were
   reasonable and beneficial to the public, in view of its responsibilities and

⊕⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the right of purchasers to obtain the identical article which they desired to buy.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 13; Dec. Dig. ☞17.]

6. MONOPOLIES ☞17—SALES OF GOODS—DISCRIMINATION.

The refusal of such manufacturer to sell its syrup for bottling to a party other than its licensed bottlers, and to permit such party to use its trade-mark in connection with the bottled product, was not a violation of Clayton Act Oct. 15, 1914, c. 323, § 3, 38 Stat. 731, providing that it shall be unlawful to sell goods for use or resale, or to fix a price therefor, or discount or rebate from such price on the condition that the purchaser shall not use the goods of a competitor, where the effect may be to substantially lessen competition or to create a monopoly in any line of commerce, in view of the possibility of adulteration and the hardship to the manufacturer of maintaining such supervision over the bottling as it deemed necessary, if required to sell to every intending purchaser.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 13; Dec. Dig. ☞17.]

In Equity. Suit by the Coca-Cola Company against J. G. Butler & Sons. Decree for plaintiff.

The plaintiff seeks to enjoin the defendants, who constitute a mercantile firm, doing business under the firm name of J. G. Butler & Sons, from using, in connection with the manufacture, advertising, offering for sale, or sale of any beverage, the words "Coca-Cola," or any like word or words, and in any other manner infringing upon the plaintiff's rights as owner of the trade-mark "Coca-Cola," and also seeks an accounting of the damages sustained by it, by reason of the unlawful use of its trade-mark.

The material allegations in the complaint are: That the plaintiff is now, and has been ever since 1892, manufacturing and marketing a syrup for making a beverage sold to the public under the name of "Coca-Cola." That it became vested with and entitled to the sole and exclusive right to use that trade-mark, which has been duly registered in the United States Patent Office on May 14, 1892, under the provisions of the Act of Congress of March 3, 1891, c. 565, 26 Stat. 1106. That on April 22, 1905, registration of the said trade-mark was again allowed by the Commissioner of Patents under the Act of Congress approved February 20, 1905, c. 592, 33 Stat. 724. That it has manufactured and marketed, and is now manufacturing and marketing, two kinds of said syrup—one designed and adapted for making a beverage by mixing with carbonated water at soda fountains in the presence of the purchaser, which is intended for immediate consumption, and is a fountain drink, and is well known to the public. The other kind is designed and adapted to be used, and is used, for manufacturing a carbonated beverage put up and sold for consumption in bottles; each of them being sold by the plaintiff in distinctive packages, bearing its trade-mark name on distinctive labels. That it has at all times insured and safeguarded the manufacture and bottling of said carbonated bottled beverage made from its "Coca-Cola" bottling syrup, by selecting, designating, and licensing the bottlers using the said bottling syrup, and inspecting and supervising the manufacture, carbonating, and bottling of said beverage by said bottlers, so as to safeguard and insure the purchasers and consumers of said bottled product as to the quality, purity, and character thereof, and has under such circumstances and conditions, and none others, allowed and permitted the use of the name "Coca-Cola," as the trade-mark therefor, and as plaintiff's guaranty of the authenticity of the said carbonated and bottled beverage, and plaintiff's supervision, inspection, and approval thereof, and responsibility therefor. So that in connection with a bottled drink the name "Coca-Cola" is plaintiff's guaranty of genuineness and fidelity that such drink is properly made of proper materials, and is plaintiff's assur-

ance of cleanliness and excellence of manufacture, carbonating, bottling, and sale, and is so relied upon by the purchasers and the public. That it has expended large sums of money in advertising to the public that its beverage, under its trade-name, can be had at fountains and in bottles, and that the bottled product which is offered to the public in bottles, with plaintiff's trade-mark name "Coca-Cola," applied to the bottled beverage, means to the public a beverage produced wholly under conditions which plaintiff supervises and controls, and one guaranteed throughout by plaintiff to be so produced, and to be wholesome, palatable, and uniform, and is so understood by the public. It is then charged that the defendants have put upon the market in bottles a product somewhat resembling in taste and appearance the plaintiff's bottled "Coca-Cola," but which is not plaintiff's bottled "Coca-Cola," and had applied to the crown of the bottles containing said defendant's product, and upon labels attached to the bottles, the name "Coca-Cola," as the trade-mark name therefor, without plaintiff's permission or authority; that by reason thereof the public is being deceived into the belief, contrary to the fact, that the product of the defendants is the bottled product guaranteed by the plaintiff, as aforesaid.

The answer of the defendants pleads that they are not sufficiently informed as to some of the allegations that are set out in the complaint, and therefore demand strict proof thereof. They deny that they have put upon the market in bottles any product resembling in taste and appearance the plaintiff's bottled "Coca-Cola," but allege the truth to be that the article they have put on the market is the genuine, identical article and product known as "Coca-Cola." They admit that they have applied to the crowns of the bottles containing such product, and upon labels attached thereto, the name "Coca-Cola," but deny that it was done without authority. They allege that they purchased said product for the identical purpose to which they have applied the same, from individuals and corporations who were the lawful owners thereof, and authorized to sell the same to these defendants for the purpose of retailing the same, bottled and carbonated as "Coca-Cola," and therefore they deny that the result of this use by them has been to deceive the public into the belief, contrary to the fact, that the product of the defendants is the product guaranteed by plaintiff to be properly made of proper materials, and made, carbonated, and bottled under the plaintiff's authority and supervision. They then plead that the plaintiff, by adopting a system of exclusive contracts, has undertaken to divide the country, and especially the territory in which the defendants are operating, into districts, whereby they have agreed to sell to such persons and corporations alone, and exclusively thus contracted, which was done for the purpose of establishing and maintaining a monopoly in the sale of said product, and preventing and destroying competition in the sale thereof, among the different purchasers, and have refused and still refuse to sell and furnish such product or commodity to the defendants upon the same terms and conditions and at the same price as they are furnishing and selling this commodity to other purchasers thereof, all of which it is charged is for the purpose and object of lessening the competition and creating a monopoly in the sale of said syrup, in violation of the laws of the United States.

The cause was submitted upon an agreed statement of facts. From this it appears: That the plaintiff is the owner of the trade-mark "Coca-Cola," and it has been used by it and its predecessor in title since May, 1886. That it was duly registered as a trade-mark in the United States Patent Office, in conformity with the laws of the United States, as set out in the complaint. That it has advertised the same throughout the United States and in foreign countries; and that over $10,000,000 have been expended by the plaintiff in advertising it. That it is made up for the public in two forms, as alleged in the complaint. That the following differences, among others, are made between the syrup "Coca-Cola" manufactured to be used at fountains and that to be sold in bottles: In 1,250 gallons of the finished product the bottler's syrup contains 1,000 pounds more sugar than the other. It has 10 per cent. more coloring matter, to wit, caramel. It contains more phosphoric acid, and some percentage less of caffeine, than does the syrup made to be used at soda fountains. The fountain syrup contains 28 pounds of caffeine to 1,250 pounds

of the finished product, while that used in the bottler's syrup contains only 25 pounds of caffeine to 1,250 pounds. That the plaintiff in its sales system has two methods by which the product is sold:

First. The system by which the syrup manufactured for fountain sale is sold to jobbers and dispensers, to be sold from the soda fountain; the jobbers selling it to the dispensers under a contract that the plaintiff will supply it only in the original package, that the jobber is not to sell or offer for sale as "Coca-Cola" any imitation of or substitute therefor, and upon compliance with the terms of the contract plaintiff will allow certain rebates to the jobber, depending upon the quantity bought, provided that the sales have been to dispensers only, and none to bottlers, or for the purpose of carbonating in bottles. The dispensers' contract, which he is required to sign, obligates him that, when "Coca-Cola" is asked for, he will only supply "Coca-Cola" as manufactured and furnished by the plaintiff, not to sell or offer for sale as "Coca-Cola" any imitation of or substitute therefor, and if he complies with these terms he is to receive a rebate, depending upon the quantity bought by him. The plaintiff does not enter into a dispenser's contract directly, but only through the jobber. The fountain syrup is never sold for the purpose of bottling, and is not made or intended for the purpose of having the same bottled.

Second. The syrup made for bottling purposes is sold to two corporations—one "The Coca-Cola Bottling Company," and the other "Coca-Cola Bottling Company." This sale is made under and by virtue of contracts entered into between the plaintiff and the bottling companies. There was an original contract, which was later amended. The original contract was made on the 21st day of July, 1899, and by this contract the bottling company obligated itself to establish in the city of Atlanta, Ga., a bottling plant for the purpose of bottling this syrup, with carbonic acid and water, and to prepare and put up in bottles, or other receptacles, a carbonated drink containing a mixture of "Coca-Cola," syrup, and water charged with carbonic acid gas under a pressure of more than one atmosphere; the syrup to be in proportions of not less than one ounce to eight ounces of water. It also obligates itself to keep on hand a sufficient quantity to supply the demand in all the territory embraced in the agreement; that it is to buy all the "Coca-Cola" syrup from the plaintiff, upon the terms set forth, and it is not to buy any substitute therefor, or other syrup or substances, nor attempt to use or imitate in any article prepared by them "Coca-Cola" syrup. The plaintiff is also to furnish all necessary labels and advertising matter at its own cost. The right to use the name "Coca-Cola" and all the trade-marks and designs for labels then owned and controlled by the plaintiff, and the right to vend such preparation, or mixture, bottled or put up in bottles, in the United States, except the six New England states and the states of Mississippi and Texas, is granted to them exclusively; but the right to use the name, trade-mark, and labels is to apply only to the carbonated mixture described, and is not to apply to the soda fountain business.

This contract was later amended by requiring the bottling company to buy all of the "Coca-Cola" syrup necessary to comply with the agreement directly from the plaintiff; not to sell, or in any way dispose, without the written consent of the plaintiff, of any "Coca-Cola," except after it is carbonated and bottled. The labels and advertising matter furnished by the plaintiff are to be paid for by the bottling company at what the actual cost and freight expense may be. By another amendment made to these contracts on April 24, 1915, the provision whereby the bottling company was to purchase the syrup directly from the plaintiff was amended by eliminating the condition that the bottling company is to buy all the "Coca-Cola" necessary from the plaintiff. It also eliminates from the former contracts those provisions by which the bottling company obligated itself not to use any substitute, or substitutes, or to attempt to use or imitate "Coca-Cola" syrup, and in lieu thereof the bottling company agreed not to manufacture, deal in, sell, offer for sale, use, or handle, nor attempt to do so, either directly or indirectly, any product that is a substitute for or imitation of "Coca-Cola." By another provision in this last amendment to the former contracts the plaintiff selects the bottling company as its sole exclusive customer and licensee, for the purpose of bottling

"Coca-Cola" in the territory heretofore acquired by it, and it agrees not to sell its fountain syrup to any one, when it knows that such syrup is to be used for bottling purposes; that under these contracts the bottling companies are not permitted to bottle the syrup manufactured for fountain purposes; that the two bottling companies have, with the approval of the plaintiff, given the right to certain local companies, which are established in different localities, for the purpose of bottling the bottling syrup of the plaintiff; that such a contract was made with the Little Rock Coca-Cola Bottling Company, for certain territory, which includes the town of Russellville and county of Pope, where the defendants are carrying on the business sought to be enjoined by this proceeding.

It is further stipulated that the plaintiff sets the standard by which its product is to be bottled, and by a system of inspection and supervision inspects and supervises the bottling of its product, wheresoever made; that it requires that its bottled product shall be bottled, using certain proportions, that the plants must be kept clean, and the cases and bottles sent out in a sanitary and presentable manner, a close supervision being kept over the character of the goods sent out; that a minute inspection is maintained in regard to the character, purity, and wholesomeness of the bottled "Coca-Cola." The bottling companies have no connection in any way, shape, or manner with the sale of the fountain product. This supervision and inspection extends to all plants that bottle "Coca-Cola," no matter where situated. The difference between these two products arose from the fact that it developed, in the process of bottling, that the product, when bottled, stood for a longer time after its carbonation than did the syrup used at the fountains, and therefore, in order to provide for this contingency, a difference had to be made in the bottled product, and further that the character of the trade was best supplied by making a specific syrup for the particular purpose of bottling; that the syrup is not consumed by the public, only after being mixed with the proper proportions of water; that the system of supervision and inspection exercised by the plaintiff and the parent bottling companies consists of the following:

In order to see that the product is bottled in a certain manner, and that the business is properly conducted, a system of supervisions has been organized by the plaintiff, known as the "Inspection Department." This inspection department has a competent man at the head, whose duty it is to divide up the territories in such a manner that they can be covered advantageously by the inspectors. Five inspectors in this department operate in the Southern States. The head inspector routes these different inspectors and follows them up. A report is required from these inspectors from each different plant visited. Samples of the product are taken from the plant, which product is tested in the plant, to see whether or not the product conforms to the standard established; these inspectors being trained men. The inspectors are equipped with gas test gauges and hydrometers and other instruments to enable them to determine whether or not the product is being put up according to instructions. They carry other gauges and other things to test each machine used by the bottling plant, to determine whether or not the machines are throwing the proper amount of syrup into each particular bottle. Samples are taken of the product, both before and after the process of carbonation. These samples are forwarded to the head inspector at Atlanta, where they are chemically examined, and if any difference appears they must immediately make the changes necessary to bring them to the standard prescribed by the plaintiff. If necessary, the chemical expert and a member of the advisory board are sent to make personal investigations of the plant.

The water used in the carbonating is chemically tested, and the sanitary condition of the plant is investigated, the latter being one of the main questions considered at all times. The question of carbonation in making the bottled product is given strict attention by the inspectors and chemical experts; proper carbonation depending upon the machinery, the kind of water, and the temperature of the water used. As warm water cannot be carbonated, the bottling plants are required to install cooling plants to get the proper carbonation. The proper amount of carbonic acid gas, not only

gives the product life, but helps to preserve it against deterioration, and thereby preserves the standard of the product. This supervision and inspection is carried on in each and every bottling plant.

It is further stipulated that the defendants have not been given a contract, nor express permission, directly or indirectly, to bottle either product of the Coca-Cola Company, nor use the trade-mark "Coca-Cola." Notwithstanding this fact, the defendants are engaged in the manufacture and bottling of beverages, and are bottling and putting upon the market a product, a bottle of which is filed as evidence. The syrup used in making up this product by the defendants is the fountain syrup manufactured by the Coca-Cola Company, and which they obtain in the course of trade from jobbers or retailers who have purchased the fountain product of the Coca-Cola Company, and they bottle it without permission or authority from the plaintiff, and apply the trade-mark "Coca-Cola" thereto, by using the tops and labels of the plaintiff on the product, without authority from any one authorized to give it. These purchases are made from parties who are the lawful owners thereof, and who sell the same to the defendants in the due course of trade. The plaintiff, as well as the bottling companies, have refused to sell to the defendants the syrup for the purpose of bottling, although the defendants offered to purchase and pay therefor, and objected to their using the trade-mark "Coca-Cola" in connection with their bottled product, or to do anything to the plaintiff's syrup for the purpose of reselling or using the same.

Moore, Smith, Moore & Trieber, of Little Rock, Ark. (Reed & Rogers, of Chicago, Ill., and Candler, Thomson & Hirsch, of Atlanta, Ga., of counsel), for plaintiff.

Mehaffy, Reid & Mehaffy, of Little Rock, Ark., for defendants.

TRIEBER, District Judge (after stating the facts as above). It is not disputed by the defendants that the plaintiff is the lawful owner of the trade-mark "Coca-Cola," that it is an asset of great value, and that the defendants are bottling, offering for sale, and selling a bottled preparation, under the name of "Coca-Cola," using the tops and labels prepared by the plaintiff for the preparation bottled under its supervision, and furnished by it to those who are engaged in bottling it, under its authority or license, and that these tops and labels indicate to the public that it is the plaintiff's preparation, made under its supervision and guaranteed by it. Although counsel have argued many important questions, there are only two issues, which under the allegations in the bill, answer, and agreed statement of facts are necessary for the determination of this case:

(1) That the preparation bottled by the defendants is made of syrup made and sold by the plaintiff, and that it was purchased by the defendants for the identical purpose to which they have applied the same, and from parties who were the lawful owners thereof by purchase from the plaintiff, but not from the plaintiff, nor from its authorized vendees.

(2) That by its manner of doing business, as is fully set out in the agreed statement of facts, the plaintiff seeks to establish an unreasonable monopoly in restraint of trade, and therefore in violation of the Act of Congress of July 2, 1890, c. 647, 26 Stat. 209, known as the "Sherman Act," and the amendments thereto, and the Act of October 15, 1914, c. 323, 38 Stat. 730, and known as the "Clayton Act."

[1, 2] In determining the issues in this case it is important to keep in mind the well-established principle of law that the protection given

by law to trade-marks has a twofold object: To protect the owner in his property, and to protect the public from being deceived by reason of a misleading claim that the article bearing the trade-mark is the article manufactured by the owner of the trade-mark, when in fact it is not, but a substitute. The use of any simulation of a trade-mark, which is likely to induce common purchasers, exercising ordinary care, to buy the article to which the trade-mark is affixed, thereby indicating that it is the product of the owner of the trade-mark, is unlawful and will be enjoined. McLean v. Fleming, 96 U. S. 245, 251, 24 L. Ed. 828; Kann v. Diamond Steel Co., 89 Fed. 706, 711, 32 C. C. A. 324, 329; Layton Pure Food Co. v. Church & Dwight Co., 182 Fed. 24, 34, 104 C. C. A. 464, 474.

[3] As the plaintiff, according to the allegations in the complaint and the agreed statement of facts, in addition to selling its product, guarantees it to be wholesome, palatable, and uniform, as well as its cleanliness and excellence of manufacture, carbonating, and bottling, and for that purpose maintains a very elaborate system of supervision, it would not only be an imposition on the public, who purchase the bottled preparation, but may cause great damage to the plaintiff, if permitted.

If a person buying the bottled preparation, which has all the indicia of having been put up under the plaintiff's supervision and guaranty, the tops and labels on the bottles giving assurance of that fact, should sustain an injury by reason of the fact that it was improperly prepared, was unclean, contained unwholesome ingredients, had insufficient carbonic acid gas for its preservation, and by reason thereof is unfit as a beverage, or for any other cause, due to the negligence of plaintiff's licensed bottler, is injured, the plaintiff may be liable to heavy damages. Having assumed this guaranty of its bottlers, the plaintiff not only has the right, but it is its duty, to take such steps as are necessary, by a proper system of inspection, to guard the public, as well as itself, against this danger. The well-recognized rule of law is that the manufacturer of any article of food, drink, or drug intended for consumption, or of any dangerous articles, may be liable to the ultimate purchaser and consumer for negligence causing an injury, although there is no direct contractual relation between them, such an action resting on tort, and not on contract. Waters-Pierce Oil Co. v. Deselms, 212 U. S. 159, 29 Sup. Ct. 270, 53 L. Ed. 453; Standard Oil Co. v. Murray, 119 Fed. 572, 57 C. C. A. 1; Huset v. J. I. Case Threshing Machine Co., 120 Fed. 865, 57 C. C. A. 237, 240, 61 L. R. A. 303; Riggs v. Standard Oil Co. (C. C.) 130 Fed. 199; Keep v. National Tube Co. (C. C.) 154 Fed. 121; Ketterer v. Armour (D. C.) 200 Fed. 322; Mazetti v. Armour, 75 Wash. 622, 135 Pac. 633, 48 L. R. A. (N. S.) 213, Ann. Cas. 1915C, 140; Thomas v. Winchester, 6 N. Y. 397, 57 Am. Dec. 455; Statler v. Mfg. Co., 195 N. Y. 478, 88 N. E. 1063; Wellington v. Oil Co., 104 Mass. 64; Roberts v. Brewing Co., 211 Mass. 449, 98 N. E. 95; Norton v. Sewall, 106 Mass. 143, 8 Am. Rep. 298; Bishop v. Weber, 139 Mass. 411, 1 N. E. 154, 52 Am. Rep. 715; Peters v. Johnson, 50 W. Va. 644, 41 S. E. 190, 57 L. R. A. 428, 88 Am. St. Rep. 909; Peterson v. Standard Oil Co., 55

Or. 511, 106 Pac. 337, Ann. Cas. 1912A, 625; Tomlinson v. Armour & Co., 75 N. J. Law, 748, 70 Atl. 314, 19 L. R. A. (N. S.) 923; Dixon v. Bell, 5 Maul. & Sel. 198.

The fact that the syrup used by the defendants is that manufactured by the plaintiff, assuming that it had been made for bottling purposes, is immaterial, for the syrup, although the principal ingredient of the finished product, is only one of several used for the preparation, when offered to the consumer. To maintain the reputation, and consequently the favor of the consuming public, it is important to the manufacturer of the preparation bearing its trade-mark that it should be wholesome, palatable, clean, and free from all impure and dangerous substances, regardless of the fact whether it was bottled by itself and sold by it directly to the consumer, or through its licensees. In this case the bill charges, and the agreed statement of facts admits, that the plaintiff manufactures two different syrups, one for bottling and the other for fountain trade; that the syrup for bottling purposes differs in several material respects from that intended for the fountain trade; that the bottler's syrup contains more sugar, has 10 per cent. more caramel for coloring purposes, contains more phosphoric acid, and less caffeine than the fountain syrup; and these two syrups are put up and sold in distinctive packages.

The authorities are numerous that, when a manufacturer of only one article of food and drink sells it in bulk, and also puts it up in bottles, the latter bearing a distinctive trade-mark, a purchaser of the article in bulk will be guilty of unfair competition, and enjoined, if bottling it and affixing the manufacturer's distinctive labels upon the goods bottled by him. Krauss v. Peebles Co. (C. C.) 58 Fed. 585, 592; People v. Luhrs, 195 N. Y. 377, 89 N. E. 171, 25 L. R. A. (N. S.) 473; Hennessy v. White, Cox, Manual Trade-Mark Cases, 377; Browne on Trade-Marks, §§ 910, 759, and authorities there cited. One of the reasons given for this rule is that, "unless the manufacturer can control the bottling, he cannot guarantee that it is the genuine article prepared by him." To this may be added that he cannot tell whether it is bottled in so careful a manner as is essential to the preservation of the article and the maintenance of its good reputation. This rule, of course, applies with much greater force when there are two varieties manufactured by the same party and sold under the same trade-mark, but intended to be placed on the market for different purposes, as is the case in the instant cause. Russia Cement Co. v. Katzenstein (C. C.) 109 Fed. 314; Cook & Bernheimer v. Ross (C. C.) 73 Fed. 203; Thomas G. Plant Co. v. May Mercantile Co. (C. C.) 153 Fed. 229; McIlhenny v. Hathaway (D. C.) 195 Fed. 652; Gillott v. Kettle, 3 Duer (N. Y.) 624; Spalding v. Gamage, 32 R. P. C. 273; Sebastian on Trade-Marks, page 159; Hopkins on Trade-Marks, page 275. A case almost identical with the facts in this case is Charles E. Hires Co. v. Xepapas (C. C.) 180 Fed. 952.

In Powell v. Birmingham (Yorkshire Relish Case) 14 R. P. C. 730, it was testified that the difference between the two articles under consideration was only a pinch of salt, and the court held that, even in the case of such a small difference, the defendant had not proven

the identity of their product with the plaintiff's. Of what benefit would a trade-mark be, if one buying the article protected by it were permitted to adulterate it, or given an opportunity to do so, and then offer it to the public as the genuine article, protected by the trade-mark? The greatest value of a trade-mark is the reputation established by the excellence of the article, and the knowledge and appreciation of that fact by. the consuming public. An article without any merit can derive no benefit from a trade-mark, and only a temporary benefit from the most extensive advertisement. It is like the value of a "good will" in an established going concern. It depends upon the successful operation of the business. Without that there is no value to it. Who would pay for the good will of a business conducted at a loss? The court is clearly of the opinion that, upon the facts in this case, the defendants are guilty of unfair competition.

[4] Do the facts show a violation of the Sherman Act against monopolies and stifling competition? The trade-mark laws, like the patent laws, give the owner a monopoly which neither the Sherman Act nor any other act of Congress forbids. It would be a paradox to say that the exercise of a right, expressly granted by law, is unlawful.

[5] Counsel for defendants rely on Dr. Miles Medical Co. v. Park & Sons Co., 220 U. S. 373, 31 Sup. Ct. 376, 55 L. Ed. 502, and Coca-Cola Co. v. Bennett (D. C.) 225 Fed. 429. What was decided in the Dr. Miles Medical Company Case was that the manufacturer of an unpatented proprietary medicine cannot, after an absolute sale of the article, fix the prices for future sales. The court, in its opinion in that case, holds that the restraint of trade must be determined by the particular circumstances of the case, and the nature of the principles which are involved in it, and whether it is reasonable or unreasonable. In Coca-Cola Co. v. Bennett, there was no question of unfair competition claimed by the plaintiff, which is the cause of complaint in this case. Nor was there any claim in that case that the plaintiff guaranteed the purity, cleanliness, wholesomeness, and quality, by using its distinctive tops and labels on its bottles, and that, for the purpose of protecting itself against claims for damages on that guaranty, it maintains a system of supervision and inspection, as set out in the agreed statement of facts herein. Nor did it appear in that case that the defendants used for bottling the syrup intended for soda fountains, and which was not suitable for that purpose. The court also found that the defendants made the preparation in the identical manner contemplated by the parties. That case is therefore not applicable. In view of the responsibilities of the plaintiff and the right of the purchasers to obtain the identical article, which they desire to buy, the requirements of the plaintiff are reasonable, and in the end beneficial to the public.

[6] Are plaintiff's acts in violation of the "Clayton Act"? That act provides (section 3):

"That it shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies or other commodities, whether patented or unpatented, for use, consumption or resale within the United States or any territory thereof or the District of Columbia or any insular possession or

other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

This act is invoked by the counsel for the defendants, in view of the agreed statement of facts that:

"The plaintiff, as well as the bottling companies, through whom its syrup is sold to the retail dealer, have refused to sell to the defendants the syrup for the purpose of bottling, although the defendants offered to purchase and pay therefor, and objected to their use of the trade-mark 'Coca-Cola,' in connection with their bottled product."

Whether that act is to be construed so as to compel one to sell his wares or manufactures to any one applying therefor cannot be determined in this case, as this is not an action to obtain relief of that nature, and is therefore not involved. Any one interested in that question may consult Union Pacific Coal Co. v. United States, 173 Fed. 737, 97 C. C. A. 578, and Great Atlantic & Pacific Tea Co. v. Cream of Wheat Co. (D. C.) 224 Fed. 566, affirmed 227 Fed. 46, —— C. C. A. ——.

The issue in this case, as has been hereinbefore set forth, is whether one purchasing one of the ingredients of a preparation, although it be the chief one, can use it, without permission of the manufacturer, in such a manner that it may injuriously affect the manufacturer, the intending purchaser having the means to adulterate it, and by the use of the trade-mark and name of the manufacturer sell it to the public as the genuine article. It would, although not impossible, certainly be a great hardship on the plaintiff, if it were required to permit its preparation to be bottled in every community throughout the United States, no matter how small the purchases for that community may be, and maintain such supervision over the bottling as under its system it maintains and deems necessary. By confining its sales to bottling companies doing business in cities so centrally located as to be able to supply the demand for its syrup, and at the same time enable it to supervise the bottling under its system, it does all which can be reasonably expected of it, and the law demands. The plaintiff, like all other manufacturers and dealers, is no doubt anxious to extend its trade as much as possible, and self-interest, if nothing else, will induce it to permit its preparation to be bottled in as many places as the trade, and its own interests, will justify.

The court is of the opinion that the defendants are guilty of unfair competition, and that the business of the plaintiff, as conducted, is not in violation of any of the "anti-trust acts" of the United States. A decree granting a permanent injunction in conformity with the prayer of the bill may be prepared and submitted to the court for approval.