**DENISON MATTRESS FACTORY,**
Appellant,

v.

**The SPRING–AIR COMPANY, Appellee.**

No. 18774.

United States Court of Appeals
Fifth Circuit.

Sept. 6, 1962.

Rehearing Denied Oct. 31, 1962.

Joe A. Keith, Sherman, Tex., for appellant.

James E. Henderson, Sherman, Tex., Charles L. Stewart, Jr., Chicago, Ill., for appellee.

Before JONES, BROWN and GEWIN, Circuit Judges.

GEWIN, Circuit Judge.

The Spring-Air Company, an Illinois Corporation, Plaintiff-Appellee, recovered judgment against Denison Mattress Factory, a Texas Partnership, Defendant-Appellant, under the terms of a contract executed by the parties on December 20, 1954, designated as "Spring-Air Products Related Companies Agreement". 'The recovery was allowed for various advertising assessments and fixed fee assessments claimed by Spring-Air under the contract including assessments made pursuant to the By-Laws at annual meetings of the Spring-Air group.

The defense asserted by Denison is to the effect that the contract is illegal, void and unenforceable because the same violates the antitrust laws of the United States, the State of Texas, or both.

The facts may be summarized briefly as follows: Spring-Air was organized with capital of $88,560.00 and has offices in a furniture display space located in the Furniture Mart in Chicago. It is composed of a group of 34 small bedding manufacturers who attempt to compete with large national bedding manufacturers by making Spring-Air products of uniform nature and quality; and by advertising such products in national magazines. Spring-Air designs uniform specifications for the Spring-Air line of bedding products which are then manufactured by the 34 stockholder companies in their respective factories, and funds for national advertising are contributed by the 34 stockholders. Denison voluntarily joined the Spring-Air group on the date of the contract in 1954. It also manufactures certain bedding products under its private brand names, which it has done since 1900, including the period 1954–1958 while the contract in question was in effect. Denison's "private-brand" business amounted to some figure in the neighborhood of one and a half million to three million dollars per year, many times the amount done in the Spring-Air line, and this phase of its business was not materially affected in any manner by the contract involved. Denison bought materials for its private-brand products wherever it desired, manufactured and sold such products wherever it wished in

Texas, Oklahoma, Mexico, Arkansas and Louisiana.

In October 1957, Denison attempted to withdraw from the group and terminate its contract without paying what it owed to Spring-Air. Each member (manufacturer) owned 216 shares of stock in Spring-Air of the par value of $10.00 per share. Denison had the right to surrender its stock and receive a credit on its account in the amount of $2,160.00. This suit originated on July 24, 1958, when Spring-Air sued Denison for the amount claimed under the contract. Spring-Air owns a number of trademarks for mattresses and box springs, all of which are registered in the United States Patent Office pursuant to provisions of Title 15 U.S.C.A. §§ 1051–1127. It licenses the use of these trademarks throughout the United States. The relationship between Spring-Air and Denison is that of licensor and licensee.

In its defense, Denison asserts that the contract is obnoxious to the Federal Antitrust Statutes and Antitrust Laws of the State of Texas. The chief contentions of Denison and the contractual provisions involved may be grouped as follows:

1. Division of trade territory.[1]

2. Restrictions relating to the purchase of materials.[2]

3. Price fixing.[3]

4. Restrictions on the manufacture and sale of competing products; and the use of Spring-Air's specifications and products.[4]

5. Restraints on sale or use of products or materials upon termination of the contract.[5]

1. "Manufacturer shall not manufacture, sell, ship or deliver Spring-Air products outside of its assigned sales service area nor shall it make any sale of Spring-Air products if it knows that the purchaser intends to resell, deliver or ship the same for resale out of said assigned sales area * * *"

2. "To assure uniformity of the nature and quality of Spring Air products manufactured and sold by Manufacturer and other related companies licensed under Spring Air trademarks, Licensor may designate a supplier or suppliers for any or all materials specified in the specifications for Spring Air products, and Manufacturer shall purchase all materials so specified by Licensor required by Manufacturer in the manufacture of Spring Air products from the supplier, or from among the suppliers, so designated by Licensor. In lieu of designating other suppliers, Licensor may procure materials and direct that Manufacturer purchase such materials from Licensor."

3. "Manufacturer agrees * * * not to * * * engage in a policy of cut-price selling of Spring-Air products, nor combine or agree with retailers to engage in such policies * * *. Manufacturer also agrees not to increase wholesale prices on any Spring Air products to the extent that they become unprofitable for retailers to handle. To further the policies stated in this paragraph and to establish differentials between different models, Licensor may from time to time suggest prices for one or more Spring Air products and notify Manufacturer of such suggestions."

4. " * * * However, such products [Manufacturer's private bedding products] which Manufacturer sells outside of Manufacturer's exclusive Spring Air sales service area (a) shall not bear any tag or label referring to a Karr unit [Supplier of Manufacturer], (b) shall not be advertised or referred to orally or in writing as containing Karr units or any variation thereof, and (c) may now and hereafter contain Karr units like those used in Manufacturer's private brand bedding products at the date hereof, but may not hereafter contain any Karr units different from those used at the date hereof, of a type then called for in the specifications for any then current Spring Air Product.

"During the term of this agreement (a) Manufacturer * * * shall not, directly or indirectly, manufacture or sell any other nationally advertised bedding products which are in competition with Spring Air products except under Manufacturer's private brand name."

"Manufacturer shall use Spring Air specifications * * * only in the manufacture and sale of Spring Air products, and shall not use them for its private brand products * * *."

5. "Upon termination of this agreement for any reason by either party or by mutual consent, Manufacturer shall dispose of all Spring-Air products in its possession in a

The trial court heard the testimony of Denison's active partners and sales personnel; the Executive Vice-President of Spring-Air; and the General Manager of the Houston licensee of Spring-Air, and in its findings of fact and conclusions of law decided that the defenses were not supported by the evidence and accordingly entered judgment in favor of Spring-Air.

■ Contracts in restraint of trade at common law were not criminal in nature nor did they give rise to a civil action by one aggrieved thereby, but were simply void and unenforceable. The effect of the Sherman Antitrust Act was to make these contracts in restraint of trade, which were void at common law, unlawful in a positive sense and created a civil action for damages in favor of the injured party.

■ All covenants in restraint of trade are not invalid. In United States v. Addyston Pipe & Steel Co., 6 Cir., 85 F. 271, (1898), it was said:

"Covenants in partial restraint of trade are generally upheld as valid when they are agreements (1) by the seller of property of business not to compete with the buyer in such a way as to derogate from the value of the property or business to be sold; (2) by a retiring partner not to compete with the firm; (3) by a partner pending the partnership not to do anything to interfere, by competition or otherwise with the business of the firm; (4) by the buyer of property not to use the same in competition with the business retained by the seller; and (5) by an assistant, servant, or agent not to compete with his master or employer after the expiration of his time of service. Before such agreements are upheld, however, the court must find that the restraints attempted thereby are reasonably necessary (1, 2, and 3) to the enjoyment by the buyer of the property, good will, or interest in the partnership bought; or (4) to the legitimate ends of the existing partnership; or (5) to the prevention of possible injury to the business of the seller from use by the buyer of the thing sold; or (6) to protection from the danger of loss to the employer's business caused by the unjust use on the part of the employé of the confidential knowledge acquired in such business. * * *

"It would be stating it too strongly to say that these five classes of covenants in restraint of trade include all of those upheld as valid at the common law; but it would certainly seem to follow from the tests laid down for determining the validity of such an agreement that no conventional restraint of trade can be enforced unless the covenant embodying it is merely ancillary to the main purpose of a lawful contract, and necessary to protect the covenantee in the enjoyment of the legitimate fruits of the contract, or to protect him from the dangers of an unjust use of those fruits by the other party."

Tri-Continental Fin. Corp v. Tropical M. Enterprises, 5 Cir., 265 F.2d 619 (1959), held a restrictive covenant prohibiting the purchaser of a vessel from operating the vessel for a period of ten years between ports in Georgia, Florida, Mississippi, Alabama and Louisiana as a car ferry, train ferry, etc. or service between such ports or places for transportation of passengers, cargo, etc. was reasonable in time, territory and extent and hence did not violate the antitrust laws. Other ancillary restraints have been up-

manner consistent with this agreement not later than the date of termination. Any Spring-Air products not so disposed of within such time shall be shipped promptly to Licensor or to any consignee designated by Licensor, F.O.B. Manufacturer's plant, and Licensor shall pay

Manufacturer its net receipts from the sale or other disposition thereof."

"On termination of this contract for any reason Manufacturer shall forthwith return to Licensor without charge all unused Spring Air labels of all kinds which it may have on hand."

held against antitrust attack. Cole Motor Car Co. v. Hurst, 5 Cir., 228 F. 280 (1916). In Cole, a contract between manufacturer and dealer in motor cars, giving the dealer exclusive territory and limiting him thereto were held not to restrain trade or competition in violation of federal or state antitrust laws. A manufacturer of syrup used in beverages and furnished only to its licensed bottlers, refused to sell to others than its licensed bottlers, or to allow others to use its trademark, was held not a violation of either the Sherman Act or the Clayton Act. Coca-Cola Co. v. J. G. Butler & Sons (E.D.Ark.) 229 F. 224 (1916). A contract by which the manufacturer of a soft drink concentrate, sold under a copyrighted name, designated a soft drink bottler as exclusive bottler and distributor in a designated area, was held not to be a "monopoly" prohibited by the Sherman Antitrust Act. Brosious v. Pepsi-Cola Co., 3 Cir., 155 F.2d 99 (1946).

In Bascomb Launder Corp. v. Telecoin Corp., 2 Cir., 204 F.2d 331 (1953), cert. den., 345 U.S. 994, 73 S.Ct. 1133, 97 L. Ed. 140 (1953), certain franchise agreements prevented store operators from purchasing Bendix coin-operated washing machines unless they accepted the restrictions of franchise agreements from Telecoin. The contract whereby Bendix designated Telecoin as its exclusive distributor of such washing machines to "route" and "store" operators was upheld by the Court. The Court of Appeals for the Second Circuit referred to the case of United States v. Bausch & Lomb Optical Co. (D.C.) 45 F.Supp. 387 as follows:

"There a manufacturer agreed to sell one of its products to no one other than a single distributor. Judge Rifkind * * * said, that the Sherman Act was not violated, because the manufacturer had no monopoly of the product, and the 'restraint of trade' was (a) ancillary to a main purpose—a source of supply to the distributor—and (b) fairly protective of that distributor's inter-

ests but not so large as to interfere with the interests of the public.

"The contract in the instant case was therefore not unlawful in and of itself. The plaintiffs could win only if they proved (1) that Bendix had a monopoly in fact of the product it sold to Telecoin and 1 or (2) the exclusive arrangement, as carried out, was without a reasonable economic basis and merely served as an instrument for unduly restraining trade."

■ The cases are not numerous which have held covenants in partial restraint of trade lawful, but the cases do point out that courts are prone to look at the primary purpose of a contract to determine its validity. If the primary purpose, however disguised, is to stifle competitors and create a monopoly, then the agreement or contract is struck down. However, the cases seem to follow the principle that if the primary purpose of the contract is lawful, e. g., to protect one in the fruits of his labor, and if the arrangement was actuated by or could be explained on the basis of legitimate business justification as opposed to the desire to increase market control through economic leverage, then the court will generally hold any incidental restraint of trade, not harmful to competition of the public, to be lawful. Dehydrating Process Co. v. Smith (C.A. 1 Cir. 1961) 292 F.2d 653. Therefore, it is our duty to determine whether the general primary purpose of the contract under consideration was to protect Spring-Air in its product, and then determine more specifically whether the provisions of the contract complained of here violate any antitrust law.

Denison relies on Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951) for the proposition that ownership of a trademark does not exempt one from the federal antitrust laws. By the terms of the contracts, trade territories were allocated among the contracting parties. In that case, the District Court had found as a fact that the dominant purpose of

the restrictive agreements of the contracts there involved was to avoid all competition, either among the contracting companies, or with others. The Supreme Court further found that while a trademark merely affords protection to a name, the agreements in question went far beyond protection of the name "Timken" and provided for control of the manufacture and sale of the product whether carrying the trademark or not; and that the central purpose of the agreements was to allocate territory. The case at bar is different in the respect that the District Court found that the primary purpose of the agreement was not to avoid the antitrust laws, and that the agreement goes no further than to protect Spring-Air trademarks, especially in view of the fact that Denison's private brand products were not affected in any material manner by the agreement.

■ Unquestionably, Spring-Air has a legal right to establish a trademark and license it to others. The Supreme Court in defining the common law said in the Trademark Cases, (U. S. v. Steffens; U. S. v. Wittemann; and U. S. v. Johnson), 100 U.S. 82, 92, 25 L.Ed. 550 (1879):

> "The right to adopt and use a symbol or a device to distinguish the goods or property made or sold by the person whose mark it is, has long been recognized by the common law and the chancery courts of England and of this country, and by the statutes of some of the states. It is a property right for the violation of which damages may be recovered in an action at law, and the continued violation of it will be enjoined by a court of equity * * *."

■■ A trademark owner may extend the territory in which he has the right to exclusive use of his trademark, either by expanding his own operations, or he may introduce his trademark and create a demand for his variety of goods in new territory, by licenses subject to his control. Vermont Maple Syrup Co. v. Johnson Maple Syrup Co., (D.C.Vt.1921)

272 F. 478; E. F. Prichard Co. v. Consumers Brewing Co., 136 F.2d 512 (1943). Of course, the licensee acquires only the right to a limited use of the trademark and the control, right and title to the product remains in the licensor. Adam v. Folger, 7 Cir., 120 F. 260 (1903); Smith v. Dental Products Co., 7 Cir., 1944, 140 F.2d 140, cert. den. 322 U.S. 743, 64 S.Ct. 1146, 88 L.Ed. 1576 (1944).

### I. Division of Trade Territory

■■ A trademark cannot travel to places where there is no article to bear it and no trader to supply the article. But if the right to use the trademark is not limited to any place, city or state, it must be deemed to exist everywhere. If the owner imposes no limitations of place or time, the right to use is deemed coextensive with the whole country and perpetual. Kidd v. Johnson, 100 U.S. 617, 25 L.Ed. 769 (1879). Moreover, a licensor may lose control over a license by not taking appropriate action. If the registrant of a trademark allows or persists in allowing others to misuse his rights, he may, after an appropriate time, find that he has lost his rights through constructive abandonment. In Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60 (1900), the owner of a trademark lost his rights therein when he permitted infringers to use it until it became a generic name. Also see Dwinell-Wright Co. v. White House Milk Co., 2 Cir., 1943, 132 F.2d 822.

■ In our opinion, Spring-Air not only had a right to license its trademark to exclusive dealers, but also had an affirmative duty to itself and to the public to invoke some kind of control and restraint upon its various licensees to prevent losing its property rights thereunder. It is our opinion that the provision of the contract with respect to a division of trade territory in the circumstances of this case is not offensive to the antitrust laws. The division of territory was not the central purpose of the contract. Schwing Motor Co. v. Hudson Sales Corporation, D.C., 138 F.Supp. 899,

Aff. 239 F.2d 176; Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 413; Coca Cola Bottling Co. v. The Coca Cola Co., 269 F. 796 (D.C.Delaware 1920); The Coca Cola Company v. J. G. Butler & Sons, 229 F. 224 (D.C. E.D.Ark.1916); Cole Motor Car Co. v. Hurst, 5 Cir., 1915, 228 F. 280; The Coca Cola Co. v. Gay-Ola Co., 200 F. 720, 6 Cir., 1912; Tri-Continental Fin. Corp. v. Tropical M. Enterprises, supra, 5 Cir., 1959, 265 F.2d 619; Schine Chain Theatres, Inc. v. U. S., 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245.

## II. *Restrictions as to Purchase of Materials*

■ Denison objects to the provisions of the Agreement which required the purchase of supplies from sources designated by Spring-Air and contends that they constitute a *per se* violation of the Sherman and Clayton Acts. Such a provision is called a "requirements contract". A requirements contract is within the purview of § 3 of the Clayton Act, 15 U.S.C.A. § 14, and violates its provisions if the contract substantially lessens competition or tends to create a monopoly. Pittsburgh Plate Glass Co. v. Jarrett, D.C., 42 F.Supp. 723 (Mod. on other grounds 5 Cir., 131 F.2d 674). In Jarrett, the District Court refused to pass upon the validity of the contract involved, because it did not appear what effect the contract had on competition or the creation of a monopoly. In one case a requirements contract was held invalid, because the requirement of showing an actual or potential lessening of competition or a tendency to establish a monopoly was properly met by the proof offered. Standard Oil Co. v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949). On the other hand, in a more recent case, Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), it was held that the exclusive dealing arrangement there involved did not violate § 3 of the Clayton Act. It was held that the question to be decided in this type of case is, " * * * whether the contract forecloses competition in a substantial share of the line of commerce involved * * * * ". If the agreement does not come within the broad provisions of § 3 of the Clayton Act, it cannot come under the more narrow provisions of §§ 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2. The Tampa case holds that such contracts are not a *per se* violation of antitrust statutes.

Denison asserts that tying agreements, whereby the performance of a contract, or rights to receive benefits thereunder, is conditioned upon purchase of products, supplies or services from different (or tied) sources and which provide that products, supplies or services, other than those which are tied, are not to be purchased or used, constitute *per se* violations of the Sherman Act. Northern Pac. Ry. Co. v. U. S., 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958) (and other cases on 27 of its brief). This contention refers to the contract provision binding Denison to buy the ticking, innerspring units and labels from sources specified by Spring-Air. In Northern Pac. Ry. Co. v. United States, supra, this was said:

> "For our purposes a tying agreement may be defined as an agreement by a party to sell one product but only on condition that the buyer also purchase a different (or tied) product, or at least agree that he will not purchase that product from any other supplier."

■ Here, there was no agreement by Spring-Air to sell any of the items involved, nor was there any condition requiring Denison to also purchase a different product from Spring-Air. Instead, the agreement specified sources other than Spring-Air from which Denison should purchase specified materials as a means whereby Spring-Air could control the nature and quality of its own product under its own trademark.

The trademark would be of no worth unless the public could be sure that every mattress which bore that mark was uniform both in exterior design and interior

quality. Denison must accept the judgment of Spring-Air on this requirement. The record shows that Denison could and did purchase from competitive suppliers all of the innerspring units it desired for use in its private brand products of which its annual volume ranged between one million and three million dollars. It is doubtful that every "tie-in" device is unlawful. Dehydrating Process Co. v. Smith, supra, 292 F.2d 653.

We find nothing in the record which requires us to disagree with the findings and conclusions of the trial court on this phase of the case.

### III. *Price Fixing*

▉▉ Denison complains that the provision of the agreement which dealt with prices of Spring-Air products, and the acts of appellee in carrying out these provisions constituted price fixing and were *per se* violations of the antitrust acts. Price fixing is in violation of the antitrust laws "whether the amount of interstate commerce affected is large or small; or whether the effect of the agreement is to raise or decrease prices". United States v. McKesson & Robbins, Inc., 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1955). Denison offered as evidence of price fixing a telegram and another communication.[6] However, there was evidence that different licensees had different prices for the same products. Spring-Air claims that these were merely suggested retail prices rather than prices to be charged, and further that there is no direct evidence of an effort on the part of Spring-Air to enforce any of these suggested prices.

The report of the Attorney General's National Committee [7] points out the difficulties involved in dealing with this subject:

"Two difficult questions arise in these cases. First, does defendant's conduct constitute price fixing in purpose or effect? Sometimes, as in simple price fixing cases, the answer is easy. Often, however, where the character or effect of the conduct is equivocal, a broader view of the way the market functions is required before a court can decide whether given behavior in fact amounts to price fixing. The second question arises where price fixing is not found, but the practices reviewed may affect price formation. Then its reasonableness or unreasonableness turns on the relative significance of the competition eliminated as compared with their other purposes or effects. A court's task is to determine (1) whether defendants have enough market power to make the restriction on price competition an 'undue restrain' and (2) whether they currently exercise the power or intend to do so."

▉▉ In his finding of fact No. 17, the trial judge states:

"The Plaintiff did not violate either the Texas antitrust laws or

---

6. "WESTERN UNION TELEGRAM
"AFTER DETAILED STUDY OF PRICE SITUATION YOUR BOARD DECIDED TO RAISE RETAIL PRICES ALL SPRING AIR NUMBERS BY 10.00 EXCEPT BACK SUPPORTER AND TRI-ZONE DETAILED LETTER OF EXPLANATION BEING MAILED FROM CHICAGO NEXT WEDNESDAY NEW PRICES WILL BE ANNOUNCED EFFECTIVE SEPTEMBER 15TH WILL BE *MANDATORY* BY OCTOBR 15TH." (Emphasis added.)
"BULLETIN: NO. 62    August 30, 1956
"SUBJECT: PRICE CHANGES ON SPRING AIR MATTRESS AND BOX SPRINGS

"TO: ALL SPRING AIR PLANTS
" *  *  * (W)e wish to announce to our group that it is the decision of the Board to increase the retail prices of the present Spring Air line by $10.00 on each grade with the exception of the Back Supporter which will remain at $79.50, the Tri-Zone which will remain at $149.50 and the Super Tri-Zone at $169.50. *  *  *
"We will now show our retail prices by sewing on a price tab centered at the bottom of the brand label."

7. Report of the Attorney General's National Committee To Study the Antitrust Laws, (1955).

the United States antitrust laws in carrying out the provisions of the contract in question."

In effect this is a finding that there was no price fixing in this case; otherwise there would be a violation of the antitrust laws. This finding should be sustained unless "clearly erroneous". It is often the duty of trial courts to make a choice between conflicting evidence in reaching a conclusion. Whether the appellate court agrees with the choice made is not the question on appeal. If there is substantial evidence to support the conclusion of the trial court, we should not interfere with that conclusion.

█ As pointed out in U. S. v. Trenton Potteries Co., 273 U. S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927), "The aim and result of every price-fixing agreement, *if effective,* is the elimination of one form of competition. The power to fix prices, whether reasonably exercised or not, involves power to control the market and to fix arbitrary and unreasonable prices." By the terms of the contract, Spring-Air did not have the "power to fix prices". The trial court held in effect that what it did was not effective to control or fix prices. There was evidence before the trial court that different prices were charged by different members of the group. The conduct of Spring-Air did not reveal any effective purpose to fix prices, nor did its behavior in fact amount to price fixing. We do not approve the provisions of the contract dealing with prices; and can conceive of a course of conduct by the parties coupled with such a contractual arrangement which would be unlawful *per se,* but we cannot reach that conclusion under the facts here presented in view of the trial court's findings and conclusions.

IV. *Restrictions on Manufacture and Sale of Competing Products; and the Use of Spring-Air's Specifications and Products*

█ We come now to a consideration of the provisions of the contract relating to the manufacture and sale of other nationally advertised bedding products in competition with Spring-Air. The contract prohibits the manufacture and sale of such nationally advertised products except under Denison's private brand name; and requires Denison to use Spring-Air specifications in Spring-Air products and prohibits their use in Denison's private brands. Denison asserts that these provisions are unlawful.

The contract was terminable by Denison without cause upon six months' notice. This right of termination afforded Spring-Air six months protection for Spring-Air's competitive merchandising plans. This requirement seems reasonable considering the time it takes to make such plans effective. It is obvious that Spring-Air can legally prevent Denison from "pirating" Spring-Air's specifications. There was no evidence that either of these agreements inconvenienced Denison or restrained interstate commerce in any way. Of interest is the recent case of Baker v. Simmons Co. 307 F.2d 458, in which the court discussed an alleged "tie-in" agreement and certain requirements as to the use of Simmons beds. The Court held:

"In short, where the clear import of the sign program was to convey the message that a Beautyrest awaited the traveler inside, the Simmons Co. had ample justification in seeking to insure that the realization met this expectation. Simmons had a right, indeed a duty, to insure the truthfulness of its advertising and to exclude the possibility that a careless or capricious innkeeper might short-change his guests with a different mattress."

The provisions of the contract in the instant case are not a violation of the antitrust law per se. We reject the contentions of Denison. Bacardi Corp. of America v. Domenech, Treasurer of Puerto Rico, 311 U.S. 150, 61 S.Ct. 219, 85 L.Ed. 98 (1940); Saxlehner v. Eisner & Mendleson Co., 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60 (1900); E. I. duPont de Nemours & Co. v. Celanese Corp., (1948) 167 F.2d 484, 35 CCPA 1061.

## V. Disposition of Products and Materials Upon Termination of Contract

Having reached the conclusions set forth above herein, we find no merit in the contention of Denison that the contract provisions relating to the disposition of "all Spring-Air Products" and "all unused Spring-Air labels" presents any serious antitrust implications. If the contract is legal and binding, as we believe, the provision mentioned constituted nothing but an obligation of a contract. If the contract as a whole is legitimate, such a provision is necessary to protect Spring-Air against unjust use of the products and labels acquired pursuant to the contract. One may not terminate a contract and his obligations under it and then claim any benefits which may arise from it. The labels and component parts of mattresses and bedding products acquired pursuant to the terms of the contract are the very items which the contract sought to protect. Although factually different, a similar contention as here made by Denison was made in the case of Naifeh v. Ronson Art Metal Works, 218 F.2d 202 (C.A. 10 Cir., 1954). In Naifeh there was no contract respecting the return of goods. Here there was, and the contract should be performed. We agree with the holding in Naifeh rejecting the contention that Ronson was under a duty to take back unsold goods without deductions for transportation, handling and depreciation. In the instant case the contract covers the disposition of products on hand.

Finally, Denison contends that if the contract in question is not violative of Federal antitrust laws, they do violate the antitrust laws of the State of Texas. We agree with findings of fact Nos. 8 and 16 by the trial court,[8] in which the trial court concluded that Spring-Air's activities in the State of Texas were occasional and isolated and that the contract in question was interstate as to execution and performance. The contract should be tested by the Federal antitrust laws. The antitrust laws of the State of Texas do not apply.

Considering all of the provisions of the contract and the evidence presented for consideration, we are persuaded that the trial court decided the case correctly. The purpose of the antitrust laws is to prevent a select few in a particular field from achieving such monopolistic power as to stifle competition. An agreement which strengthens and promotes competition is not a violation of the law. As a practical matter, it would be extremely difficult for each member of the Spring-Air group effectively to compete with the large bedding manufacturers. Spring-Air is not in a position to compete. It manufactures nothing. The arrangement under consideration gave to the members of the group established brand names, trademarks and national advertising, all of which cost money which was raised by assessments and the contributions of each member. Business conducted by the licensees under their own private brand names was not affected by any material degree. Denison had the perfect right to terminate the contract in accordance with its provisions, but it should be made to pay its fair proportionate share of the expenses incurred pursuant to its promise to do so. The judgment of the trial court accomplished this result and therefore the judgment is

Affirmed.

---

8. "8. At all times pertinent hereto Plaintiff's activities in Texas were limited to occasional sales meetings with salesmen of stockholders or member companies and to one or two isolated instances where for periods of one to four days the Executive Vice President of Plaintiff went into the territory and assisted Defendant's salesmen in presenting the trademarked products manufactured by Defendant to retail dealers. All other acts performed by Plaintiff or required to be performed by Plaintiff under the contract were performed outside of the State of Texas."

"16. The contract in question was interstate as to execution and performance, and there is no evidence that shows or tends to show that the Plaintiff at any time pertinent hereto transacted intrastate business in the State of Texas."