### COTY v. PRESTONETTES, Inc.

(Circuit Court of Appeals, Second Circuit. October 31, 1922.)

No. 112.

1. **Courts ⬦270, 321—Alien can sue citizen in federal court of district of defendant's residence.**

Under Judicial Code, § 24 (Comp. St. § 991), an alien can sue a citizen of the United States in a federal District Court, but must sue in the district in which the citizen resides.

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. **Courts** ⊜⇒292—**Federal court has jurisdiction over suits involving trademarks registered under act of Congress.**

    The federal District Courts have jurisdiction over a suit to enjoin infringement of a trade-mark which plaintiff has registered under the Trade-Marks Act of Congress.

3. **Trade-marks and trade-names and unfair competition** ⊜⇒53—**Sale after rebottling or remanufacturing even with statement to that effect violates trade-mark.**

    The name and trade-mark of a manufacturer of a delicate volatile product like a perfume or a face powder containing the perfume cannot be used without his consent for the sale of his perfume rebottled by another or for the sale of a compact made of his face powder, even though it is stated that the product is rebottled or made into the compact by the other; there being evidence that in the process of rebottling or manufacturing into a compact which is not properly packed the quality of the perfume or powder may be injured.

4. **Trade-marks and trade-names and unfair competition** ⊜⇒53—**Right to resell under trade-mark depends on particular circumstances.**

    The right of a purchaser of a trade-marked article to resell it under the trade-mark depends upon the particular circumstances of each case, and the fact that it may be permitted in the case of a stable product whose quality could not be affected by careless handling and rebottling does not establish the right to do so with a delicate product like perfume.

5. **Trade-marks and trade-names and unfair competition** ⊜⇒53—**Sale of trade-marked article gives no license to resell under trade-mark if changed.**

    The sale by a manufacturer of an article identified by a name and trade-mark gives no implied permission to the buyer to do anything to that article which may change or injure its quality and still identify the article in reselling it by the manufacturer's name and mark.

6. **Trade-marks and trade-names and unfair competition** ⊜⇒53—**Primary purpose of act is protection of owner's business.**

    While the purpose of the Trade-Mark Act is twofold, the protection of a trade-mark owner's business and the protection of the public against imposition, the primary purpose is the protection of the business, since the protection of the public against fraud would not give a private right of action.

7. **Injunction** ⊜⇒9—**Plaintiff asking injunction must show civil "right" that is violated.**

    To entitle plaintiff to an injunction, he must show the existence of a civil right which is violated by the acts he seeks to restrain, and a right in law is that with which the law invests a person and in respect to which for his benefit another is required by the law to do or abstain from doing.

    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Right—Rights.]

8. **Injunction** ⊜⇒103—**Commission of crime can be enjoined if it interferes with property.**

    Though equity has no jurisdiction to enjoin the commission of crimes, it can enjoin interferences, actual or threatened, with property or rights of a pecuniary nature, though such interferences are accompanied by or are themselves crimes.

9. **Trade-marks and trade-names and unfair competition** ⊜⇒97—**New York statute gives civil rights which can be protected by injunction.**

    Penal Law N. Y. § 2354, making it a misdemeanor knowingly to sell goods represented to be the product of another unless such goods are contained in the original package, under the labels, marks, or name placed thereon by the manufacturer, gives the manufacturer of the trade-marked article a civil right which can be protected by injunction.

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

10. **Trade-marks and trade-names and unfair competition ⬅︎97—Resale under restrictions held not to give full protection of state statute.**

An order permitting defendant, without plaintiff's consent, to rebottle plaintiff's perfume and sell it under a label stating that the contents are plaintiff's independently rebottled, and to sell a face powder compact under a label stating it was compounded from plaintiff's loose powder, enabled defendant to sell as plaintiff's a product without the assurance which comes from plaintiff's own marks and labels, and did not afford either to plaintiff or the public the protection required by New York Penal Law, § 2354.

11. **Trade-marks and trade-names and unfair competition ⬅︎97—Right depending on state statute cannot be violated by acts outside of the state.**

The right given by Penal Law N. Y. § 2354, for the protection of trade-marks cannot be violated by acts committed outside of the state, so that an injunction based on that statute would have to be limited to sales within the state.

12. **Injunction ⬅︎152—Issues of law can be determined upon preliminary injunction.**

Where there are no controverted questions of fact, but the right to an injunction depends solely on issues of law, the issues can be determined on a motion for preliminary injunction.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by Francois Joseph De Spoturno Coty against Prestonettes, Inc., for the infringement of trade-marks. From an order denying a preliminary injunction as prayed for, though placing a limited restriction on defendant, plaintiff appeals. Order modified, and injunction granted, as prayed in the complaint.

Certiorari granted 43 Sup. Ct. 250, 67 L. Ed. ——.

Mock & Blum, of New York City, for appellant.

I. Maurice Wormser and Isaac Reiss, both of New York City, for appellee.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

ROGERS, Circuit Judge. This suit is brought for the infringement of trade-marks and a preliminary injunction as prayed for has been denied, although a limited restriction has been placed upon the defendant.

[1] The plaintiff is a citizen of the republic of France and a resident of the city of Paris. Under section 24 of the Judicial Code (Comp. St. § 991), an alien can sue a citizen of the United States in a federal court. He must, however, sue in the district in which the citizen resides. The alienage of the plaintiff of itself gives jurisdiction to a court of the United States as against a citizen. Vidal v. South American Securities Co. (C. C. A.) 276 Fed. 855, 865. The defendant herein is, however, a citizen of the state of New York, being a corporation organized under the laws of New York and having its principal place of business in the Southern District of New York. And as the amount in controversy herein and the value thereof is alleged in the complaint to be in excess of the sum of $3,000, exclusive of interest and costs, the District Court has jurisdiction on the ground that the suit is one between an alien and a citizen which, as we proceed, will be found to

be a fact of importance, as the defendant is alleged to have violated the statutes of the state of New York.

[2] There is an additional ground of jurisdiction, however, inasmuch as it is claimed that the defendant has infringed the trade-mark which the plaintiff has registered under the Trade-Mark Acts of Congress. The District Courts have jurisdiction in such cases.

The plaintiff is, and for a number of years has been, engaged in manufacturing in France perfumes, toilet waters, face and sachet powders, lotions for skin and hair, and other toilet preparations. His office and principal place of business is in Suresnes, which is a suburb of Paris. Previous to and in the year 1909 he alleges that he was engaged in exporting to the United States the before-mentioned toilet preparations, and selling them in this country through a representative. In that year he alleges that he adopted the trade-mark and trade-name L'Origan to designate his various preparations and to identify them to the trade in the United States and elsewhere as being of his manufacture. And in that year and continuously since that time he has exported to and sold in this country, both in interstate and intrastate commerce, his aforesaid preparations, packed in cartons, or bottles or boxes, with labels upon which the said trade-mark L'Origan was prominently placed to identify the goods as being of his manufacture. Large quantities of his preparations are alleged to have been sold in the United States, and a very large and valuable good will was built up in this country in connection with this trade-mark L'Origan as designating to the public the plaintiff's products, which have attained a very high reputation because of his skill and the excellence of the ingredients used. Indeed, since 1905 his preparations have been sold throughout the principal countries of the world, and he has come to be recognized throughout the world as one of the leading manufacturers of perfumes. His business in the United States has steadily increased, and in the year 1920 the sale of his products in this country amounted to more than $1,000,000, and in 1921 they amounted to more than $3,000,000. Prior to the bringing of this suit it is alleged that he has sold more than $7,000,000 worth of his products in the United States.

It is alleged that on October 27, 1920, the plaintiff filed an application in the United States Patent Office to register the trade-mark L'Origan for the preparations before mentioned. And on September 27, 1921, a certificate of registration No. 146,974 was issued and is still in force, and the plaintiff, it is alleged, always has been and now is the sole and exclusive owner thereof.

It is also alleged that from the commencement of his business in 1905 up to the present time the plaintiff has always caused his surname Coty to be prominently affixed to each and every container of his product that has been sold by him so that since 1905 his trade-mark has been Coty, and that, so far as he knows and as he verily believes, he has been the only person to use the name Coty throughout the world as a trade-mark for perfumes and toilet preparations.

And it is alleged that on October 7, 1920, the plaintiff, according to the provisions of the act of March 19, 1920 (41 Stat. 533), filed in the United States Patent Office an application for the registration of the·

trade-mark Coty for his toilet preparations, and that upon October 4, 1921, such registration was granted, and certificate No. 147,206 was issued to him, and that he has at all times since been the sole owner thereof and all the business and good will connected therewith.

The complaint alleges that, in addition to the great care and skill which plaintiff has exercised in producing the before-mentioned products designated by the trade-mark L'Origan, he always has been and now is very careful in exercising the best of skill in so packing his products and in particular the face powder so that they shall retain their original desirable qualities; that in particular in packing and marketing the face powder, including compacts thereof, which is and for many years has been a well-known toilet article, plaintiff always has been and now is exceedingly careful to pack said compacts tightly sealed in a container free from all metallic ingredients. Such container has always been made of cardboard or metal lined with cardboard.

The complaint also alleges that, notwithstanding the fact that plaintiff has never given any permission to any person whatever to repack his products, the defendant subsequent to September 27, 1921, and previous to the filing of the complaint, has offered for sale and has sold in the Southern District of New York and elsewhere in the United States metal containers containing a compact of face powder; that the compacts so sold by defendant were not manufactured by the plaintiff, but were manufactured by the defendant or caused to be manufactured by it; that the manufacture of such compacts involves not only the use of face powder as an ingredient thereof, but also of certain ingredients to act as binders, and that the manufacture of a proper compact requires skill and attention so as to make the compact of sufficient coherence and at the same time not render it too hard; the label upon the containers used by defendant has in large and prominent type the words "Coty's L'Origan Face Powder," and the cover thereof also clearly has the words "Coty's L'Origan" thereon; that in addition the defendant has bottled and offered for sale and has sold in the Southern District of New York and elsewhere in the United States bottles of perfume upon which said bottles appear the words "Coty's L'Origan"; that these bottles had not been filled by the plaintiff or with his consent and authority; and that the defendant never has had any right or authority to cause any labels to be made upon which the words "Coty's L'Origan" appear.

It is alleged that the effect of the sale by defendant of the before-mentioned compacts of face powder contained in the said metal containers has been to deceive the trade and public, in that the trade and the public have thought and will think that this is a new package put out by the plaintiff, and because the prominent and distinguishing feature of the said label is the use of plaintiff's name and trade-mark L'Origan; that the trade and public have been deceived into the belief that the compacts sold by defendant as above mentioned were the genuine compacts manufactured by the plaintiff, whereas the contrary is the case; that the effect of the bottling by the said defendant of perfume under the name "Coty's L'Origan" has been to cause the public to think that this perfume has been bottled and offered for sale by the

plaintiff or with his authority, whereby the plaintiff against his will has been made responsible for any lack of care or cleanliness in handling or bottling the perfume; that to bottle perfume requires care and cleanliness so that the volatile ingredients of the perfume will not evaporate, thus injuring its quality; and that the perfume shall be maintained in a perfectly clean and sanitary condition as it is often applied to the skin of the person using it.

It is alleged that the packing of a compact of face powder in a metal container injures the perfume added thereto, and which is the main cause of the sale thereof, in that said perfume contains a number of ingredients which are easily destroyed or altered so that the valuable properties of the perfume are injured. Plaintiff and the trade in general have always refrained from packing high-class toilet powders containing high-class perfume in metal containers, and the result of the acts complained of has been to injure the plaintiff's reputation connected with the said L'Origan face powder and will continue to injure its reputation in the future.

The plaintiff's products have been chiefly known to the trade and public by his trade-mark Coty, which is an uncommon name in the United States, and in the telephone directory of the city of New York there is no other person by that name. The plaintiff complains of the use of the trade-mark Coty and of the trade-mark L'Origan or Coty's L'Origan on the containers or bottles with products placed therein by defendant, and not by the plaintiff.

The plaintiff states and restates several times in his complaint that in the preparation and bottling of his perfumes and in preparation of his powders and compacts he employs great care and skill.

The affidavits presented to the court below upon the application for the temporary injunction showed that the bottles and packages in which the defendant rebottled and repacked the plaintiff's products and placed them on the market produced the impression that they contained a product "made, packed, and put out" by Coty and that defendant's name in connection therewith was that of the importer.

The affidavits also show that great skill and care is needed in the preparation and bottling of perfumes and in the preparation of powders and compacts.

The following excerpt is from the affidavit of one having no interest in this litigation and who had never had any connection in any way with the plaintiff. It relates to the making and packing of compacts, and is amply sustained by other affidavits in the case:

"I consider it a sensible precaution, and one which any perfumer is well justified in taking, to pack an article like a perfumed compact of face powder in such a manner that it will not come directly in contact with the walls of a metal container. This is because such metal containers are usually finished off with a lacquer of some kind. This had an odor of its own.

"I have had considerable experience in manufacturing compacts or face powder like that of Coty's L'Origan, for example, and I wish to state that it requires considerable care and skill to make up a good compact. The binding material must be well chosen and of first-class quality, and the manufacture must be carried out with great care and supervision so that the compact shall not be too crumbly and not be too hard. In other words, even if a good face powder is chosen as the original ingredient of a compact, it is quite possible to make a very bad compact if the binding material chosen is of

poor quality or if the manufacturing process is not carried out under skilled and careful supervision."

Another affidavit states that—

"It is very deleterious to repack a face powder perfume with a delicate odor into a compact as in every such operation a part of the original perfume is lost."

And it appears that the plaintiff has at all times objected to any repacking of his face powders, either in the loose form or as manufactured into a compact, save under his personal supervision in his French establishment.

The defendant puts the compact he places on the market with Coty's name affixed to it into a metal box. And in one of the affidavits it is said:

"The plaintiff would never think of packing a face powder or compact in a metal box where the delicate perfume which the powder or compact contains can come in contact with metal walls, and this is not considered to be good practice by producers of perfumes and toilet preparations."

In another of the affidavits it is said:

"The plaintiff * * * has always refused to pack perfumed face powder either in the loose form, or in the compact form, in metal boxes, unless lined with cardbord, etc., because this injures the perfume and the packing adopted by defendant is adapted to injure whatever perfume is contained in its compacts and injure plaintiff's reputation irreparably.

"The manufacture of a compact requires not only the use of a binder, but skill, and care in the manufacturing process so as to prevent the escape of the volatile ingredients of the perfume, and the product of a clean, sanitary article, which shall have proper coherence, but shall not be so hard as to prevent the removal of the powder by means of the puff. The sale by defendant of a compact under the plaintiff's trade-mark, with the use of ingredients and manufacturing methods over which plaintiff has no control, would cause irreparable injury."

It also appears that it is not an unusual thing for dealers who have purchased the defendant's compacts with the name Coty upon them to return them to the plaintiff thinking they were his products with the statement, "We cannot use" them.

The court below in its order provided that upon the plaintiff filing a bond in the sum of $1,000 an injunction should issue restraining the defendant and all persons acting through and under it or in privity therewith from using—

"'Coty' or any deceptive simulation thereof, or 'L'Origan' or any deceptive simulation thereof, and in particular from using 'Origan' save to resell the unaltered articles sold by the plaintiff herein in the identical containers or bottles in which said articles have been packed or rebottled by said plaintiff, save that the defendant may use the following statement to designate the unaltered perfumes sold by plaintiff if independently rebottled by defendant, said statement to appear only on labels securely affixed to defendant's bottles and containers: 'Prestonettes, Inc., not connected with Coty, states that the contents are Coty's [giving the name of the article] independent, rebottled in New York'—every word of said statement to be in letters of the same size, color, type, and general distinctiveness, and that, if the defendant makes and sells compacts of face powder from the genuine loose powder of plaintiff, it may designate such compacts by the following statement, said statement to appear only on labels securely affixed to defendant's containers: 'Prestonettes, Inc., not connected with Coty, states that the compacts of face powder herein was

independently compounded by it from Coty's [giving the name] loose powder and its own binder.  Loose powder ——— per cent.  Binder ——— per cent.' —every word of said statement to be in letters of the same size, color, type and general distinctiveness, and that the advertising, circulars, placards, documents in general, and oral statements used by defendant and the before-mentioned other persons to sell or offer for sale the articles identified by the before-mentioned labels shall conform to the requirements specified for such labels."

And from this order the plaintiff has appealed to this court.  The assignments of error upon which appellant relies are the following:

(1) That the court erred in not enjoining the defendant from rebottling the perfumes of the plaintiff and selling them with the use of his trade-marks Coty and L'Origan.

(2) That the court erred in not enjoining the defendant from manufacturing compacts of face powder from the plaintiff's powder and selling such compacts with the use of the trade-marks Coty and L'Origan.

(3) That the court erred in permitting the defendant to make any use whatever of the plaintiff's trade-marks Coty and L'Origan save to resell the identical articles produced by the plaintiff, and in the identical containers or packages of the plaintiff.

(4) That the court erred in not granting to the plaintiff the full relief prayed for, which was that injunctions be issued against the defendant enjoining it from making or causing to be made or selling or causing to be sold or offering for sale or causing to be offered for sale any perfumes, toilet preparations, or powders with the use of the trade-mark Coty or the trade-mark L'Origan, save original packages purchased from plaintiff and designated by him with the said trade-marks, and also enjoining it from infringing upon the said trade-marks in any manner whatsoever.

[3] There is no doubt, of course, that the defendant, after purchasing L'Origan face powders and perfumes from the complainant, was entitled to sell them in the original packages.  The plaintiff does not question the defendant's right to do that, and it is not involved in this case.  But this appeal raises two very different questions which may be stated as follows:

First. Can the name and trade-mark of a manufacturer of a delicate, volatile product, like a perfume, be used without his consent, to sell his rebottled perfume, provided the one who thus rebottles and sells places upon each bottle sold a label bearing his own name and announcing that he is not connected with the original manufacturer of the product, but that the contents are those of the original manufacturer, but independently rebottled by the one whose name the label bears.

Second. Can the name and trade-mark of a manufacturer of a toilet preparation containing a delicate and volatile perfume, like a face powder compact, be used without his consent to sell an independently manufactured compact, provided the independent manufacturer puts upon each container sold a label containing his own name and stating that he is not connected with the original manufacturer, and that his compact was independently compounded by him from the compound of the original manufacturer, together with his own binder and stat-

ing the percentage of each. If these questions are to be answered in the affirmative, the order below must be affirmed, but if otherwise it must be modified as prayed for by the appellant, and he is entitled to an absolute injunction. We answer the questions in the negative.

In Coca-Cola Co. v. Bennett, 238 Fed. 513, 151 C. C. A. 449, the Circuit Court of Appeals in the Eighth Circuit unanimously decided that, when a manufacturer of an article of food or drink sells it in bulk and also puts it up in bottles bearing a distinctive trade-mark, the purchaser of the article in bulk cannot legally bottle it and affix the manufacturer's label to the bottle, reversing the District Court, which had held a trade-mark not infringed by its use on the very article for which it was designed. In the Coca-Cola Case the defendant purchased the genuine Coca-Cola syrup, mixed it with carbonated water, put it up in bottles, and sold it as a Coca-Cola beverage using the trade-mark Coca-Cola on the bottled product. In changing the syrup into a beverage by the use of carbonated water the defendant claimed it did so in the same manner in which the plaintiff authorized those to do to whom it gave by contract the right to convert the syrup into a beverage and to bottle and sell the same for beverage purposes. The court said:

"It is true the defendants might sell the bottling syrup which they buy under the appellant's trade-mark; but, since they change the syrup into a beverage without the permission and authority of appellant, they have no right to sell the same under appellant's trade-mark. The argument advanced is also faulty, as it would permit persons other than the owner of the trade-mark to control its use."

It added:

"The law seems to be settled that, when a manufacturer of an article of food or drink sells it in bulk, and also puts it up in bottles, the latter bearing a distinctive trade-mark, a purchaser of the article in bulk will be guilty of unfair competition and be enjoined from bottling and affixing the manufacturer's distinctive label upon the goods bottled by him. Coca-Cola Co. v. J. G. Butler & Sons (D. C.) 229 Fed. 224; Krauss v. Peebles Co. (C. C.) 58 Fed. 585, 592; People v. Luhre, 195 N. Y. 377, 89 N. E. 171, 25 L. R. A. (N. S.) 473; Hennesy v. White, Cox, Manual of Trade-Mark Cases, 377; Brown on Trade-Marks, §§ 910, 759, and authorities there cited. One of the reasons given for this rule is that: 'Unless the manufacturer can control the bottling, he cannot guarantee that it is the genuine article prepared by him.' And as said by Judge Triver in Coca-Cola Co. v. J. G. Butler & Sons, supra: 'To this may be added that he cannot tell whether it is bottled in so careful a manner as is essential to the preservation of the article and the maintenance of its good reputation.'"

A similar question to that in Coca-Cola Co. v. Bennett had arisen previously in Coca-Cola Co. v. J. G. Butler & Sons, supra, 229 Fed. 224, which was in the District Court for the Western District of Arkansas. In this case the plaintiff was granted an injunction.

Charles E. Hires Co. v. Xepapas (C. C.) 180 Fed. 952, was almost identical in its facts with those in the Coca-Cola Cases, and the Circuit Court for the District of South Carolina granted an injunction. The complainant in that case was the manufacturer of two preparations used for making root beer. One was prepared in syrup form, ready to be prepared as a beverage by the simple addition of carbonated water. The other preparation was an extract intended to be prepared as

a beverage by the addition of sugar and water and fermented with yeast. The beverage so prepared was called "Hires" or "Hires' Root Beer." The defendant purchased the extract made by the complainant Hires and made a beverage therefrom by the addition of simple syrup and carbonated water, but did not ferment it with yeast. He sold it as Hires' root beer. The District Judge held that the defendant violated the complainant's trade-name rights in the word "Hires."

The case of Ingersoll v. Doyle, 247 Fed. 620, decided by Circuit Judge Dodge in the District Court of Massachusetts, is of interest in the matter now under consideration. In that case the defendants were absolutely enjoined from using the word "Ingersoll" in any manner in connection with genuine Ingersoll watches where the only change the defendants had made was to remove the dials from the Ingersoll watches and replace them with luminous dials of their own. The court held that—

"An Ingersoll watch of either grade, after the defendants' additions thereto or alterations therein have been made, is no longer what its makers offer to the public as a guaranted Ingersoll watch; it has become a new construction."

In that case the defendants asked that if an injunction should be granted it be qualified by adding:

"Unless the defendants impress upon the dial of any such watch words plainly legible and plainly indicating that said watch has been altered and the particulars in which it has been altered by the defendants."

The court refused to grant the defendant's request, and said:

"As to the first request, if, as I think, the defendants violate the plaintiffs' exclusive rights when they market their altered watches as Ingersoll watches without indicating the fact of alteration thereon, they would still be violating the plaintiffs' exclusive rights if they marketed such watches as Ingersoll watches, with the proposed indication thereon. They would still be marketing as Ingersoll watches, watches not such in their entirety, but new constructions. The defendants do not stand as if they had rights of their own to market other watches as Ingersoll watches, and were bound only to distinguish their product from the plaintiffs'."

Counsel for the defendant has called our attention to Russia Cement Co. v. Frauenhar, 133 Fed. 518, 66 C. C. A. 500, decided by this court in 1904. The complainant in that case manufactured glue of different grades which it sold under the trade-name of Le Page. The defendants purchased certain of such glue in bulk, and bottled and sold it under the name of "Le Page's Glue," with a statement that it was manufactured by complainant and bottled by defendants. An injunction was refused. But in that case it appeared that at the time the defendants bought the glue from the complainant they informed it that they purchased for the express purpose of bottling it. The glue was put into bottles with labels bearing no similarity to those of the complainant. The labels read:

"Le Page's Fish Glue, manufactured by Russia Cement Company, Gloucester, Mass. Bottled by Columbia Wax Works, New York."

This court said that:

"In these circumstances we are unable to discover any ground on which complainant is entitled to the interposition of a court of equity on its behalf."

[4] But that case is plainly distinguishable from this in its facts. The court held that the plaintiff could not complain because defendant used the trade-name on its inferior grade of glue inasmuch as the plaintiff itself did exactly the same thing so that there was no fraud upon the public. However, in cases of this nature each case must be decided according to its own particular circumstances. The product involved in the Russia Cement Co. Case was glue, a stable product whose quality could not be affected by careless handling and rebottling. In the case now before the court the plaintiff's product is a delicate, volatile product intended for personal use, and is one that can be easily ruined by improper handling and bottling, and the powder preparations are such that their quality can be easily impaired by packing them in improper containers.

The case of Appollinaris Co. v. Scherer (C. C.) 27 Fed. 18, held that, where the defendant had purchased water known as Hunyadi Janos and then had himself bottled it in bottles containing the same label as that used by the one who originally bottled it, an injunction would not be granted the court declaring that, as the defendant was selling the genuine water, the trade-mark was not infringed. In that case, unlike the case now before the court, there was no evidence to show that in rebottling there was any danger of impairing the value of the water, or any necessity for the use of great care or skill. The case is in its circumstances therefore clearly distinguishable from the one now before us.

In Fred Gretsch Mfg. Co. v. Schoening, 238 Fed. 780, 151 C. C. A. 630, the complainant had purchased in Germany a package of violin strings manufactured in that country by C. A. Mueller, the strings being identified by the trade-mark Eternelle. The defendant had the exclusive agency for the sale of Mueller's strings in the United States and had, with Mueller's consent, registered the trade-mark Eternelle in the United States. The only question was as to the right of Schoening to import into the United States and sell here the violin strings under the trade-mark Eternelle. The court simply held that, as the goods imported were the genuine goods made by Mueller, the importer could sell them under Mueller's trade-mark. No question of replacing the goods was involved.

In A. Bourjois & Co., Inc., v. Katzel (C. C. A.) 275 Fed. 539, the plaintiff, a New York corporation, imported in bulk a face powder manufactured in France by a French firm and sold there under the trade-mark Java. The defendant conducted a retail pharmacy in New York City and bought in France of the manufacturer the same genuine face powder, brought it to New York in the original boxes, and sold it in the same boxes. The New York corporation had bought the business and good will in the United States of the French firm. The plaintiff repacked in New York the powder which it imported. The plaintiff sold its powder under the name of "Poudre Java" and put on the bottom of its boxes:

"Made in France. Packed in the U. S. A. by A. Bourjois & Co., Inc., of N. Y., Succ'rs in the U. S. to A. Bourjois & Cie and E. Wertheimer & Cie."

The defendant sold the powder under the name "Poudre de Riz de Java," which was the name by which the plaintiff called its powder prior to 1916 when it abandoned that name for that of Poudre Java. But, as it appears from the opinion below (D. C.) 274 Fed. 856, 858, that the box or package in which defendant sold its powder was the box in which the powder was sold in France, the question of repacking was not involved. The right of the original manufacturer to be protected against the repacking of a face powder and the dangers incident thereto was not presented or argued. All that this court decided was that, as the goods were the genuine goods covered by the trade-mark, the rights of the owner of the trade-mark had not been infringed. The case is therefore plainly distinguishable from the instant case.

[5] When a manufacturer sells an article identified by his name, he gives no implied permission to anybody to do anything to that article which may change or injure its quality and still identify it by his name, and any such act is a trespass which alone is a sufficient foundation for an injunction. If the plaintiff must allow anybody who buys his perfumes in the original bottles or containers in which he has put them with his label upon them to rebottle them or place them in different containers and sell them as the plaintiff's product, it is evident that he is at everybody's mercy, and, to protect himself, would be under the necessity of employing a staff of detectives and chemists to prevent persons, over whom he is without authority and without right of supervision, from injuring and adulterating the products with which his name is coupled. That irreparable injury might result from permitting the defendant, and, if the defendant, then others, to do what he has done and is doing, is, we think, plainly evident. The protection of the product in the original bottle and in the original package is of vital importance in such a case as this. The proper bottling of a perfume is essential to its retaining its quality. If through carelessness, or ignorance, or economy, the rebottling is not according to the plaintiff's standards, or some unscrupulous person should adulterate the perfume, irreparable injury to the reputation of the plaintiff's product would result. In the same way the value of a face powder or other toilet preparation may be seriously impaired by the use of improper containers or by using unsuitable ingredients for binders. It was said in People v. Luhrs, 195 N. Y. 377, 385, 89 N. E. 171, 174 (25 L. R. A. [N. S.] 473), that—

"If milk were sold in bottles under a label stating that it is the product of a dairy well known to be reliable, and that it was placed in those bottles by the proprietor of the dairy, the public have the right to buy on the strength of the label and to invoke the protection of the law in making the purchase. The assurance that it was so bottled adds to the value of the milk, for, if true, it excludes the possibility of substitution and fraud. The bottling is a material fact, for if done by the owner of the trade-mark it guarantees the quality of the article and furnishes the purchaser with the means of distinguishing it from any other."

All this is applicable to the case under consideration. The plaintiff's name upon the original bottles of his perfume and upon the original packages of his toilet powders is a guaranty of quality and a means of distinguishing them from any other. Neither the plaintiff nor would-

be purchasers of his can be adequately protected if any dealer can take them out of the container and rebottle or repack them in a different container and sell them as the plaintiff's product. To hold otherwise is to open the door to imposition and fraud, and to practices difficult to detect, and it would impair seriously the value of the trade-mark.

[6] The courts have not authoritatively and finally determined whether a trade-mark is to be primarily regarded as protecting the trade-mark owner's business or as protecting the public against imposition by its unauthorized and improper use. But we venture to think that, while the purpose of the Trade-Mark Acts is twofold, the primary purpose is the protection of the trade-mark owner's business. If the sole purpose of the act be the protection of the public, that certainly cannot constitute a sound reason for affording a private remedy. Fraud upon the public cannot be the ground of private action or suit. Leather Cloth Co. v. American Leather Cloth Co., 4 De G., J. & S. 137, 141, affirmed in 11 H. L. Cas., 523; Webster v. Webster, 3 Swans. 490, note; Schneider v. Williams, 44 N. J. Eq. 391, 14 Atl. 812. But, whatever difference of opinion may have existed on this subject, we think the Trade-Mark Acts operate and are intended to operate for the protection of the business of the owner of the trade-mark and also for the protection of the public against imposition and fraud. And in order that this intent of the acts may be given its fullest effect we think the plaintiff herein is entitled to the injunction which he seeks. He is the manufacturer of what is described as a delicate, volatile product which it is shown can be ruined by improper handling and bottling, and can be easily adulterated. To permit the plaintiff's name and trade-mark to be used on other than his original packages should be forbidden, as the value of his name and trade-mark would be endangered through the deterioration of his product due to the action of unauthorized and unsupervised persons in changing the perfumes from the receptacles in which they were originally placed into others which may be wholly unfit even though the perfumes remain unadulterated.

Before concluding this opinion we deem it proper to refer to another phase of this case. The complaint alleges as an additional ground of jurisdiction the violation by the defendant of a statute of the state of New York. And it appears that section 2354 of the Penal Law of New York (Consol. Laws, c. 40) subsec. 6, contains a provision upon which the plaintiff relies. It is to be found in the margin.[1]

The section referred to was before the New York Court of Appeals in People v. Luhrs, 195 N. Y. 377, 89 N. E. 171, 25 L. R. A. (N. S.) 473. That court declared that the intention of the Legislature in enacting the statute was "to thoroughly protect both the public and the owner from the furtive use of trade-marks in any way," and it held that

[1] Section 2354 of the Penal Law of the state of New York, subsec. 6, states that a person commits a misdemeanor who "knowingly sells, offers or exposes for sale, any goods which are represented in any manner, by word or deed, to be the manufacture, packing, bottling, boxing or product of any person, firm or corporation, other than himself, unless such goods are contained in the original packages, box or bottle and under the labels, marks or names placed thereon by the manufacturer who is entitled to use such marks, names, brands, or trade-marks."

the statute prohibited the sale of goods represented to have been made by the owner of a trade-mark, except as contained in the original package and as put up by him under his label. It said that the protection extends "to the bottling of a liquid, for instance, as well as the making thereof," and that "the trade-mark and label guarantees that the whisky in the bottle has not only been manufactured by the Wilson Distilling Company, but that the contents of the bottle have been placed in that identical bottle by the said company." The court declared that—

"In buying a bottle with a trade-mark thereon the purchaser does not acquire the right to use the trade-mark except to sell the original contents of the bottle. He cannot lawfully use the trade-mark to sell whisky of any kind bottled by himself. He cannot say, as he does in effect when he sells from a bottle bearing the Wilson label, 'This is Wilson whisky, put in this bottle by the Wilson Company.' He can still use the whisky or sell it, but he cannot sell it as Wilson whisky placed by the Wilson Company in the bottle exhibited at the time of the sale, for that would open the door to a kind of fraud that is easy to practice, difficult to detect, and dangerous in result. To so hold would tend to undermine the law of trade-marks, for the original package might be filled repeatedly with spurious goods, with no probable chance to discover the fraud."

It was claimed in that case, as there was no proof that the article sold was not Wilson whisky, the crime was not proved. But both the Appellate Division and the Court of Appeals thought it immaterial whether the rebottled whisky was Wilson whisky or not. In the opinion in the court below Judge Clarke said that—

"In this age of bottled and canned goods the assurance to the public that the goods asked for and received have been packed by the manufacturer is as important as that they have been manufactured by him. This assurance is given by the marks and labels."

If the intention was to protect the right of the trade-mark owner as well as the public, as the New York courts have said, then the statute must have created by implication at least the right which it seeks to protect, if that right was previously nonexistent, and the right so created is plainly a property right.

[7] To entitle a plaintiff to an injunction he must show the existence of a civil right and that the acts of which he complains and which he seeks to restrain constitute a violation thereof. In law one has a "right" to whatever he may lawfully claim. That with which the law invests a person and in respect to which, for his benefit, another is required by the law to do or to abstain from doing, is in legal contemplation a right in the persons so invested. And as was said in McDonald v. Bayard Savings Bank, 123 Iowa, 413, 98 N. W. 1025, "right" and "obligation" are correlative terms. And the provision of the New York statute above referred to in imposing an obligation to abstain from rebottling another's product and using thereon the original trade-mark impliedly creates in the owner of the trade-mark for whose benefit in part we have seen the statute was enacted, a right which the latter is entitled to protect by means of such remedies as the law affords.

[8] It may be said that this is a criminal statute, and that the jurisdiction of equity does not enjoin the commission of crimes. If so, the answer is found in the language of the Supreme Court in Re Debs, 158 U. S. 564, 593, 15 Sup. Ct. 900, 909 (39 L. Ed. 1092) where in reply-

ing to the objection that it is outside the jurisdiction of equity to enjoin the commission of crimes that court replied:

"This as a general proposition, is unquestioned. A chancellor has no criminal jurisdiction. Something more than the threatened commission of an offense against the laws of the land is necessary to call into exercise the injunctive powers of the court. There must be some interferences, actual or threatened, with property or rights of a pecuniary nature, but when such interferences appear the jurisdiction of a court of equity arises, and is not destroyed by the fact that they are accompanied by or are themselves violations of the criminal law."

[9] In the instant case the injunction should issue not because the defendant is committing a criminal offense under the New York law, but because what it is doing is an actual interference "with property or rights of a pecuniary nature" which are recognized and protected under the law of New York. In the instant case the acts of the defendant were committed in the state of New York, and the defendant is a New York corporation.

In B. V. D. Co. v. Kommel the District Court for the Southern District of New York issued an injunction restraining the defendants from selling the plaintiff's goods except in original packages without obliterating identifying trade-marks. The injunction was not issued upon general equitable principles, but on the ground that the defendants had violated the statute of the state of New York. The case was appealed to this court, where it was reversed, not because of error in holding that an injunction could issue because of a violation of the New York Statute, but because this court thought that the acts complained of were insufficiently proven. The case in this court is reported in 200 Fed. 559, 119 C. C. A. 39.

If the defendant cannot under the New York statute sell the plaintiff's goods represented to have been made by the owner of a trade-mark except as contained in the original package and as put up under his label (the original manufacturer's label), then the defendant in what it did clearly violated the statute and was entitled to an injunction.

[10] This brings up the question whether the form of the order which the court below has entered sufficiently recognizes and protects the plaintiff's rights under the New York statute. That order permits the defendant, without the plaintiff's consent, to rebottle the plaintiff's perfumes and sell them under a label which it puts upon them stating "that the contents are Coty's independently rebottled in New York and enables defendant to sell the compact face powder under a label which he places upon the container stating that the powder was independently compounded by it from Coty's loose powder and its own binder, giving the per cent. of each. But this, as it seems to us, enables the defendant to sell as Coty's a product without the assurance which comes from Coty's own marks and labels. It does not afford either to Coty or to the public the protection which the statute requires, namely, the assurance of Coty himself.

[11] If the plaintiff's right to an injunction restraining the defendant from selling the plaintiff's products as Coty's except in the identical containers or packages in which the plaintiff placed them depends exclusively upon the New York statute, the injunction cannot be unlim-

ited in its terms, but must be restricted to acts done by the defendant within the state of New York. A right called into existence by a state statute cannot be violated by acts wholly done outside the state which passed the law. Rehbein v. Weaver (C. C.) 133 Fed. 607. But for reasons stated' in the earlier part of this opinion we do not think the plaintiff's right rests alone upon the New York statute, but his right rests upon the general principles of the law of trade-marks. The Trade-Mark Acts should be so construed as to afford full, and not partial, protection to the business of the owner of the trade-mark, and should be conducive to fair and honest business methods.

That there may be no misapprehension as to this decision, we think it desirable to say that we have not overlooked the fact that it is not charged in the complaint nor stated in any of the affidavits presented that the defendant in doing the acts complained of in any way lacked or failed to exercise in the rebottling of the plaintiff's perfume the proper skill necessary to preserve the perfect quality of the plaintiff's product. If we assume that the defendant handles the plaintiff's product without in any way injuring its qualities, we think the injunction should issue on the ground that the defendant has no right to use the plaintiff's name without his consent on the particular products which the defendant rebottles or repacks, because the defendant has no right to put upon the plaintiff the burden of safeguarding the quality of his products, which such a situation would impose upon the plaintiff compelling him to keep a constant watch upon the defendant's conduct and the conduct of others who might choose to act in a similar way.

[12] The defendant insists that the question of the issuance of the injunction should be left for final hearing, and not determined upon a motion for a preliminary injunction. But the question which this case raises is simply one of law. There are no controverted questions of fact, and therefore the issue may be determined upon preliminary injunction.

The order appealed from must be modified, and the injunction granted as prayed in the complaint.