## BOURJOIS, Inc., v. HERMIDA LABORATORIES, Inc.

### No. 6950.

Circuit Court of Appeals, Third Circuit.

Aug. 9, 1939.

Briesen & Schrenk, of New York City, and Harry B. Rook, of Newark, N. J. (Karl Pohl and Hans V. Briesen, both of New York City, of counsel), for appellant.

Samuel S. Stern, of Jersey City, N. J. (Morris L. Stern, of Jersey City, N. J., of counsel), for appellee.

Before BIGGS, MARIS, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

The commercial activities of the present defendant do not leave a very pleasant taste. It is a corporation formed by one Straus, the manager of a 5, 10, and 25¢ store at Linden, N. J. The purpose of its creation under the confidence inspiring name, Hermida Laboratories, was the distribution for profit of plaintiff's feminine face powder. One must feel that the tragic struggle of the human race against its inevitable end is poignantly limned by its pathetic reliance on symbols sounding in cure. Although the purpose here is the alleviation of appearance rather than of disease and caters to vanity rather than fear, the central theme is the same and the offense thereby greater.

Straus approached the officers of the plaintiff, he says, with the suggestion that their face powder should be sold in smaller and cheaper boxes. He generously offered to carry out his own idea and be the distributor. The plaintiff asserts that this scheme had already been under consideration by them and that anyway they were not "having any" of Hermida Laboratories. They accordingly proceeded with their own plans and arranged with their own agents to pack and sell the smaller packages.

Everyone is agreed that the "law of the case" must be sought in the decision of the United States Supreme Court in Prestonettes, Inc. v. Coty, 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731. There the court reversed the holding of the court below (2nd Circuit Court of Appeals, speaking through Rogers, J., 285 F. 501). In that case Mr. Justice Holmes lent the prestige of his great name to a doctrine that does not appeal very greatly to the sense of fairness of the ordinary man and that has been critically analyzed by experts in the field, Handler and Pickett, Trade-Marks and Trade Names—An Analysis and Synthesis, 30 Columbia Law Review 168, 173; Derenberg, Sale of Reconditioned Articles as Trade Mark Infringement, 32 Bulletin of United States Trade Mark Association (New Series) 15; cf. Wertheimer, Does the Trade Mark Right End With the Sale of the Goods?, 17 Bulletin of United States Trade Mark Association (New Series) 153. The Prestonettes case permitted the descriptive use of a "mark", already permitted in England, Tallbot v. Wille, 3 R.P.C. 266, Stone v. Steelace Co., 45 R.P.C. 127, and went further by allowing it to be stamped upon the defendant's goods. The plaintiff had contended for and been granted by the Circuit Court of Appeals the naked right to prohibit the defendant from making even a qualified reference to the plaintiff's mark. Mr. Justice Holmes permitted the qualification under the condition and the sole condition that it not be accompanied by misrepresentations calculated to have the same effect as a denominative use of the mark, namely, the passing off of defendants' goods as the plaintiff's. Messrs. Handler and Pickett, whose article is cited above, sum up their conclusions on this and similar cases in these words:

"Where the plaintiff has adopted a fanciful mark and the defendant makes denominative use of descriptive or generic

language which is confusingly similar, the scope of relief should depend upon the commercial necessity for such usage by the defendant, although not all the cases recognize this.

\*    \*    \*    \*    \*

"Eliminating all false comparisons, the trade-mark and the trade name cases seem to present results which are profoundly alike. The scope of relief depends in both cases upon the defendant's necessity and not upon the etymological character of the plaintiff's mark. The question of monopoly is completely beside the point. Justification in plenty seems to exist, therefore, for the statement which has now become a meaningless fetish with so many courts, that trade-mark law is but one branch of the law of unfair competition". 30 Columbia Law Review 168, 189, 191.

Since the plaintiff, unlike some counsel who have been before us, does not ask to reverse the United States Supreme Court, it behooves us rather to apply their ruling. We must say that we do not find much difficulty in doing so. The label, like the play, being the thing, we set out the respective labels:

| Bourjois | Prestonettes Inc. |
|---|---|
| Evening In Paris | Not Connected |
| Face Powder | With Coty States |
| Repacked by | That The Contents |
| Hermida Laborato- | Are Coty's L'Origan |
| ries | Independently |
| Wholly Independent | Rebottled In |
| Of Bourjois | New York |
| | |
| Defendant's Label | Prestonettes' Label |

This deadly parallel is, we think, fatal to the contention that defendant's label is within the ruling of the Coty case. Its inscription is hardly a statement of fact: it is rather the printing of plaintiff's trade-marked appellations with a participial appendage. Grammatically the description is of plaintiff's product, the powder, not defendant's, the package. "Independently" is supplanted by "independent of" thus changing a reasonably clear characterization of the repacking into an ambiguous reference to corporate structure. The place of repacking and the salient phrase "not connected with" are omitted entirely. "Bourjois" is stressed in the layout, appearing on a single line at the top and bottom of the inscription. In short it is obvious that all the numerous points of difference between defendant's label and the Prestonettes label tend to obscure the truth—defendant's unauthorized repacking —and to afford a way of making plaintiff's marks "stand out". There can be no question then, but that plaintiff is entitled to insist upon the exact wording of the Prestonettes label as a minimum. He wishes, however, to go further in the direction of explicitness and asks for an additional sentence. This sentence would make the label read: "Hermida Laboratories, Inc., not connected with Bourjois, Inc., states that the contents are Bourjois' Evening in Paris Face Powder, independently repacked by Hermida Laboratories, Inc., at Linden, New Jersey, without the authority or consent of Bourjois which assumes no responsibility for the contents," Record, p. 15, and further asks that it be placed on the bottom of the package and that Hermida Laboratories remain in solitary glory on the top of the package.

We think that the ethics of honorable merchandising support this request. More than that, or should there be a more than that, we conceive that law as laid down by the Supreme Court authorizes it. The high court refused prohibition and permitted qualification. It approved a particular qualification drafted by a particular United States District Judge (or approved by him after drafting by the legalists). It did not, and of course could not, say that such must be for all time the standard qualification in this and analogous cases. In fact, we are sure that in their desire for truth in trade it would have welcomed some such suggestion as that which emanates from the learned counsel now before us. It is surely an amplification and arrangement in the interest of frankness. It surely meets the "commercial necessity for such usage" of the learned authors earlier cited.

We say it meets that commercial necessity unless it be that suspicions so freely expressed both in the paper books and at the argument are well founded. Those suspicions, and for the purposes of this opinion we do not further describe them, recast in our own feeble language, run along these lines. The essence of defendant's scheme is the economic anomaly of buying dear and selling dearer. As a result the public must and does get less for its money by purchasing defendant's packages rather than plaintiff's. By the same token, defendant's packages contain less powder than packages sold for the same

price by plaintiff's competitors. Accordingly, defendant yields to an obvious temptation, and has constructed its packages so that their spacious appearance belies the lack of abundance of their contents. Furthermore, defendant is under a cognate temptation to tamper with quality as well as quantity. Every penny saved by inferior or hasty repackaging, by adulteration, or even by substitution, is a penny gained. Small wonder that the plaintiff objects to this method of placing its goods before the public. As long as it is employed, the reputation of skinflint or worse is built up for plaintiff among consumers.

It is significant that the practice we have questioned has been considered objectionable in other countries. A special committee of the English Board of Trade which in 1934 investigated various proposals for trade mark reform reported: "We think, however, that if the proprietor of a registered trade mark desires to prohibit the application by other traders of his trade mark to his goods (for example, after breaking bulk or taking the goods out of their original containers) * * * or to prohibit any addition on or to his goods in fact injuring or likely to injure the reputation of his trade mark, he should be empowered to do so". Board of Trade, Report of the Departmental Committee on the Law and Practice Relative to Trade Marks, p. 49, CMD 4568.

In accordance with this recommendation, Parliament has recently enacted:

"1) Where, by a contract in writing made with the proprietor or a registered user of a registered trade mark, a purchaser or owner of goods enters into an obligation to the effect that he will not do, in relation to the goods, an act to which this section applies, any person who, being the owner for the time being of the goods and having notice of the obligation, does that act, or authorises it to be done, in relation to the goods, in the course of trade or with a view to any dealing therewith in the course of trade, shall be deemed thereby to infringe the right to the use of the trade mark given by the registration thereof. * * *

"2) The acts to which this section applies are—

"a) The application of the trade mark upon the goods after they have suffered alteration in any manner specified in the contract as respects their state or condition, get-up or packing". Trade Mark Acts 1938 (1 & 2 Geo. 6, C. 22) sec. 6(1), (2) (a).

The underlying principle of this provision · was not challenged in debate, 104 Parliamentary Debates (Fifth Series) 12-26, 64-81; 324 Parliamentary Debates (Fifth Series) 507-40; 325 Parliamentary Debates (Fifth Series) 2353-76. Though a few objections were put forward, 324 Parliamentary Debates (Fifth Series) 532–40, the members of Parliament agreed wholeheartedly with the position of His Majesty's government: "But do not let us take the view that a manufacturer who packs a particular article in a particular way is not entitled to claim that 'those goods should not be unpacked and sold in a different form, and that in making that suggestion there is anything wrong". 324 Parliamentary Debates (Fifth Series) 539.

That position seems to have been already adopted in Germany, Jungel & Magnus, Das Gesetz zum Schutze der Warenbezeichnungen, Guttentag 'sche Sammlung Deutscher Reichsgesetze, Nr. 87-b pp. 469-470. It is expressed with Gallic frankness by a leading French authority:

"La marque s'appliquait au produit tel qu'il sortait de la fabrique; elle garantissait son origine; une fois qu'il est tiré de son enveloppe, que devient la garantie de l'origine? Où peut-elle être? Le fabricant est-il encore assuré que le produit dénaturé est le sien? Quel sera son contrôle? Pour un débitant honnête, combien n'y en aura-t-il pas d'infidèles, qui ne craindront pas d'apposer la marque du fabricant sur d'autres produits que les siens? Qu'est-ce d'ailleurs que la marque, sinon la signature même du fabricant? Pourrait-on signer pour lui, imiter sa signature? Évidemment non". Pouillet, Marques de Fabrique, p. 143, sec. 165 (1875).

"The mark is applied to the product as it comes from the factory; it guarantees its origin. As soon as it is removed from its envelope, what becomes of the guarantee of origin? Where can it be? Is the manufacturer still assured that the altered product is his own? What will be his means of control? For one honest retail dealer, how many unfaithful ones are there who will not hesitate to apply the mark of the manufacturer to products other than those that belong to him? "What is, then, the mark if it is not the very signature of the manufacturer? Should one be

able to sign for him, forge his signature? Evidently not." (Translation.)

One final matter: at the argument we inquired about the plaintiff's powder. The learned counsel very fairly made no attempt to conceal the disparity between the cost of the simple ingredients which go toward glamour and their price to the frail creatures who regard that state as a goal. That almost fantastic chasm is set forth by ingredients in an appendix to Lamb's American Chamber of Horrors, p. 344:

nature's "laboratories" the public were held to be deceived and the deceivers not entitled to relief. One might argue that misrepresentation of ingredients is no worse than misrepresentation of value. Come the millennium we are prepared to do so. While waiting that happy day to be here again we improve on Shakespeare and on the President with a "plague on both your powders".

The case was before the learned district court on application for preliminary

Springtime in Paris (Bourjois) Double Vanity (Naturelle)

Serial No. T-8

Selling Price......$1.75

| Powder | | | | | Approximate cost |
|---|---|---|---|---|---|
| 62.14% | Talc ................. | .0186 oz. at | $0.0087 | oz. ............... | .000016 |
| 26.96% | CaCO₃ .............. | .0081 oz. at | .0087 | oz. ............... | .000007 |
| 5 % | ZnO ................. | .0015 oz. at | .016 | oz. ............... | .000002 |
| | Rouge | | | | |
| 74 % | Talc ................. | .022 oz. at | .0087 | oz. ............... | .000019 |
| 19.2 % | CaCO₃ .............. | .0057 oz. at | .0087 | oz. ............... | .000005 |
| 5 % | Dye ................. | .0015 oz. at | 1.00 | oz. ............... | .0015 |
| 1 % | Perfume (Approx).... | .0003 oz. at | 3.00 | oz. ............... | .0003 |
| | Cost of case....................................................... | | | | .25 |
| | | .0577 oz. Approx. Cost at retail | | | 0.251849 |

We might then cogitate the question of clean hands (we avoid the word play) and raise it sua sponte (it is for obvious reasons not otherwise raised). Here again we think that law has lagged behind need. The extent to which the former, not the latter, seems to have gone is embodied in the famous California Fig Syrup case, Worden & Co. v. California Fig Syrup Co., 187 U.S. 516, 23 S.Ct. 161, 47 L.Ed. 282; Nims, Unfair Competition and Trademarks 517; but see Le Blume Import Co. v. Coty, 2 Cir., 293 F. 344, 360. The rule there laid down does not protect against less than fraud. The syrup there was cathartic all right, but because the producing agent came from man's rather than

injunction. We are aware of the rule restricting the Chancellor's latitude on such occasion. The authorities applicable to its scope on the subject matter of the case at bar are collected in the West Digest System sub nomine, Trade Mark, Trade Names and Unfair Competition, ☞95(1). We think that the learned district judge might have taken a different view if plaintiff-appellant had seen fit to furnish an indemnity bond. That is the procedure approved by this court in Weissbard v. Coty, Inc., 3 Cir., 66 F.2d 559.

The order of the district court is reversed and the case is remanded with instructions to enter a decree in accordance with the prayer of the bill.